736 So.2d 162 (1999)
STATE of Louisiana
v.
Todd WESSINGER.
No. 98-KA-1234.
Supreme Court of Louisiana.
May 28, 1999.
Rehearing Denied July 2, 1999.
*168 Clive Adrian Stafford Smith, New Orleans, Counsel for Applicant.
Richard P. Ieyoub, Attorney General, Douglas P. Moureau, District Attorney, *169 John W. Sinquefield, Dale R. Lee, Baton Rouge, Counsel for Respondent.
KIMBALL, Justice.[*]
This case involves a direct appeal to this court from a conviction of two counts of first-degree murder and a sentence of death for each count of first-degree murder. La. Const. art. V, § 5(D). Defendant argues eighteen separate assignments of error in this appeal. Because we find that none of theses errors are meritorious, we affirm defendant's sentence and conviction.

FACTS
This case arises from the murder of two employees of Calendar's Restaurant in Baton Rouge on Sunday, November 19, 1995, at approximately 9:30 a.m.
The evidence shows that defendant, a former employee at Calendar's, rode his bicycle to the restaurant that morning armed with a .380 semi-automatic pistol. Mike Armentor, a bartender at the restaurant, saw defendant just outside of the restaurant, and they exchanged greetings. Immediately after entering the restaurant through a rear door, defendant shot Armentor twice in the back. Although Armentor sustained severe abdominal injuries, he survived.[1]
Defendant then tried to shoot Alvin Ricks, a dishwasher, in the head, but the gun would not fire. As Ricks ran out of the restaurant, defendant attempted to shoot him in the leg, but the gun misfired. As he was running across the street to call 911, Ricks told Willie Grigsby, another employee of the restaurant who escaped the restaurant without being seen by defendant, that he had seen the perpetrator, and the perpetrator was Todd. Ricks also told the 911 operator that the perpetrator was Todd.[2]
Stephanie Guzzardo, the manager on duty that morning, heard the commotion and called 911. Before she could speak to the operator, defendant entered the office, armed with the gun. After a short exchange with Guzzardo, in which she begged for her life, defendant, after telling her to "shut up," shot her through the heart. Guzzardo died approximately thirty seconds after being shot. Defendant then removed approximately $7000 from the office.
Defendant next found David Breakwell, a cook at the restaurant who had been hiding in a cooler, and shot him as he begged for his life. Defendant then left the restaurant on his bicycle. EMS personnel arrived at the scene shortly thereafter, and Breakwell died en route to the hospital.
Defendant was eventually arrested and charged with two counts of first degree murder. Testimony adduced at trial established that defendant had asked one of his friends to commit the robbery with him, and that he planned to leave no witnesses to the crime. Several people also testified that they had seen the defendant with large sums of money after the crime. The murder weapon was subsequently discovered, along with a pair of gloves worn during the crime, at an abandoned house across the street from defendant's residence. One of defendant's friends testified that defendant had asked him to remove the murder weapon from the abandoned house. Defendant was convicted of two counts of first degree murder for the deaths of Breakwell and Guzzardo and sentenced to death. The jury found three aggravating circumstances: (1) that defendant was engaged in the perpetration or attempted perpetration of aggravated burglary or armed robbery; (2) that defendant knowingly created a risk of death or great bodily harm to more than one person; *170 and (3) the offense was committed in an especially heinous, atrocious, or cruel manner.

PRE-TRIAL ISSUES

Tainted evidence/ defendant's assignment of error number 2
In this assignment of error, defendant argues the trial court erred when it denied his motion to suppress evidence that was allegedly illegally seized from him. Although defendant did in fact file a motion to suppress, neither this motion nor defendant's appellate brief specifies precisely what evidence was illegally seized from him.
The record shows that a hearing was held on several of defendant's motions, including this motion to suppress, on March 26, 1997. Detective Keith Bates, who was the case officer on defendant's case and who was present when defendant was arrested, testified extensively at this hearing. Bates testified that defendant was Mirandized immediately after his arrest, which occurred at an apartment complex in Garland, Texas on November 28, at approximately 10:45 p.m. Defendant was again advised of his rights at 11:35 p.m., after he had been taken to the Garland Police Station. After being advised of his rights for the second time, defendant indicated that he understood theses rights, waived them, and agreed to talk to Bates. Defendant admitted to riding his bicycle in the vicinity of Calendar's at the time of the crime, but denied any involvement in the crime. Sometime after the interview began and defendant had answered some of Bates' questions, defendant voiced his desire to speak with a lawyer. Bates then immediately stopped the interview and did not attempt to question defendant further.[3]
Bates also testified that he searched defendant's residence pursuant to a search warrant, and he searched the apartment where defendant was arrested pursuant to the consent of the lessee of the apartment. Bates also obtained a warrant to search a vacant house, which was located across the street from defendant's home, pursuant to information he received from a person in Texas who had spoken with defendant. This search yielded the murder weapon, gloves, and a bag that was used in the crime. Additionally, a criminalist and a police officer had both collected evidence at the crime scene. Evidence was also seized in connection with the defendant's arrest. Further testimony established that none of the individuals whose statements to and conversations with the police lead to evidence were state agents.
The suppression hearing thus showed that no evidence was illegally seized from defendant. The only statement that defendant made while in custody was a denial of knowledge about the crime, and he was aware of and had not yet invoked his Miranda rights when he gave this statement. Further, no physical evidence was obtained in connection with this statement.
This assignment of error thus lacks merit.

Discriminatory jury selection/ defendant's assignment of error number 5
In this assignment of error, defendant argues the jury was impaneled in a discriminatory manner, which resulted in an entirely white jury. Defendant filed a motion to quash the general venire based on this alleged discriminatory impaneling. The record shows a hearing was held on this motion on June 17, 1997.
Linda Jones, the jury coordinator for East Baton Rouge Parish, and Kathy Harris, a jury clerk, testified as to the manner in which citizens were called to serve as jurors during the week at issue. Jones testified that the venire is randomly chosen by computer. Her office next estimates the jury needs of all the courts for that day and the appropriate number of *171 jurors is summoned. In the instant case, the prospective jurors were told to report to the central jury pool room, and Harris began walking through the room and handing out panel information sheets to people in the room at 9:00 a.m. Jones specifically testified that the panels were not chosen on a "first come, first serve" basis, as there was no way of knowing who had first arrived in the room. Rather, Harris simply walked throughout the room, front to back and side to side, giving the sheets to people who were already in the room and people who were arriving in the room; people also approached Harris to receive sheets, and some sheets were passed down aisles. The first 110 people who received sheets comprised panel one, which was the panel from which the jury was chosen in the instant case; the next panel chosen was panel two, and so on. The panel in the instant case dropped to 106 people when it was discovered that 4 of the individuals had reported to the wrong room.
The panel was then divided into subpanels; there were 6 sub-panels of 16 people each and one sub-panel of 10 people. This was accomplished through the use of service cards. A card was made for each juror, and Harris then shuffled the cards several times, divided them into two groups, shuffled each group individually, and then combined the two groups and shuffled them a few more times. Harris then laid out the first seven cards in seven stacks and continued laying the cards in stacks until all of the panels were filled. The cards were face down when she was placing them in these stacks.
Although potential jurors were still arriving when Harris began to hand out the sheets, both Jones and Harris estimated that 200 people were there at that time, and they had no way of knowing which of these jurors had arrived first. Harris also testified that she did not single out certain people to receive sheets; she simply passed them out, as her job was to ensure that everyone had a sheet.
The trial court found that the jury selection was random and denied the motion. Supervisory writs were denied by both the first circuit and this court. State v. McKnight, 97-1355 (La.6/20/97) 695 So.2d 1364; State v. Wessinger, 97-1666 (La.6/23/97); 696 So.2d 982. The fact that we have previously denied supervisory writs does not preclude us from considering this issue in this direct appeal. State v. Fontenot, 550 So.2d 179 (La.1989). However, there is no reason to disturb the trial court's ruling in this appeal.
Defendant argues that jurors were selected on a "first come, first serve" basis; that is, the first jurors to arrive would comprise the panel from which the jury would be selected. Defendant claims that this practice was discriminatory because "those jurors who were less affluent, and therefore relied on public transportation, would be less likely to arrive early and, under the Baton Rouge process, less likely to be allowed to serve as jurors." Defendant also asserts that discrimination is shown by the fact that black people were underrepresented in the panel, as only 13 of the 64 jurors called were black, while the population of East Baton Rouge Parish is approximately one-third black. Defendant does not, however, offer any empirical evidence to support his theory, nor does he demonstrate how this method of jury selection discriminates against any certain segment of the community.
"A general venire, grand jury venire, or petit jury venire shall not be set aside for any reason unless fraud has been practiced, some great wrong committed that would work irreparable injury to the defendant, or unless persons were systematically excluded from the venires solely upon the basis of race." La.C.Cr.P. art. 419. The burden of proving the basis for setting aside the venire rests with defendant, and this burden requires that he show more than underrepresentation of people of a certain race from the venire; *172 rather, he must prove that this underrepresentation is the result of a systematic exclusion of members of a certain race in "the source or sources from which jury venires are chosen." State v. Lee, 559 So.2d 1310, 1313 (La.1990).
Defendant has not met that burden in this case, for he has not shown that blacks were systematically excluded from the venire. Rather, the evidence adduced at the hearing shows that the venire was selected randomly, and there were no concerted efforts to preclude any segment of the population from serving on the jury. The initial jury pool was chosen by computer. The jury information sheets were distributed randomly to form the panel from which the jury that was to hear defendant's case would be chosen. The jury cards were shuffled several times and then placed, face down, into stacks representing the sub-panels. We cannot say the trial judge erred in finding this process random.
This assignment of error thus lacks merit.

Pretrial Publicity/ defendant's assignment of error number 9
In this assignment of error, defendant contends the trial court erred by denying his motion for a change of venue based on the pre-trial publicity surrounding the case. The record shows defendant thrice moved for a change of venue. A hearing was held on this issue on June 17, 1997, contemporaneous with the motion to quash the venire.[4]
Dr. Robert Davis, a clinical psychologist who was accepted by the court as an expert in statistics, testified about the results of two separate local telephone polls that he had conducted for the defense. The phone numbers selected to participate in the poll were selected by computer from a CD rom of the Baton Rouge telephone directory. The numbers were randomly selected from each of the four geographic areas in East Baton Rouge Parish.
In the first poll, only 25% of the respondents remembered the crime without being cued, and no one could remember the name of the suspect. Davis felt that a change of venue was not warranted at the time of this poll.
Davis conducted a second poll after the broadcast of a news show that erroneously reported defendant would be using a "rap music defense." The poll indicated that 31% of those polled knew of this defense and had tended to believe defendant was guilty based on his alleged use of this defense.
After hearing this testimony, the trial judge deferred his ruling until after jury selection. The motion was ultimately denied after the end of voir dire.
A defendant is not entitled to a jury that is completely ignorant of his case. State v. Connolly, 96-1680 (La.7/1/97), 700 So.2d 810, citing State v. 25 Thompson, 516 So.2d 349 (La.1987), cert denied 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988). Further, "extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial unconstitutionally unfair." Connolly, 700 So.2d at 815, quoting Dobbert v. Florida, 432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1977). Rather, a defendant seeking a change of venue must show that the extent of the prejudice in the minds of the community renders a fair trial impossible. State v. Wilson, 467 So.2d 503 (La.1985), cert denied, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985). The defendant usually bears the burden of proving prejudice. State v. Williams, 96-1023 (La.1998), 708 So.2d 703. The trial judge has great discretion in ruling on a motion for change of venue, and his ruling will not be disturbed on appeal absent an abuse of this discretion. *173 Williams, 96-1023 at 23, 708 So.2d 728, quoting Wilson, 467 So.2d at 512.
Both this court and the United States Supreme Court have often examined the number of jurors excused for cause on the basis of already having a set opinion about the case to determine if there is prejudice in the mind of the community, as "[t]he length to which the trial court must go in order to select jurors who appear to be impartial is another factor relevant in evaluating those jurors' assurances of impartiality." Williams, 96-1023 at 23-24, 708 So.2d 728, quoting Murphy v. Florida, 421 U.S. 794, 803, 95 S.Ct. 2031, 2037, 44 L.Ed.2d 589 (1975). This is not, however, a bright line test, and there is no certain number or percentage of challenged jurors that will ensure the defendant a change of venue. Rather, whether a defendant should have been granted a change of venue under this standard is usually analyzed by comparison to other cases.
In the instant case, we cannot say that the trial judge abused his discretion in denying the change of venue. The record reveals a thorough examination of the prospective jurors during voir dire. Sixty-four prospective jurors were examined, and most of those who were asked if they knew of the crime responded affirmatively; however, only five prospective jurors were excused for cause on the basis that they had already formed a set opinion about defendant's guilt. Most of those who had heard of the crime had only vague recollections of the facts and could not remember either details or defendant's name. This case thus seems more similar to those cases in which the change of venue was properly denied than those in which the denial was found to be reversible error.[5]
This assignment of error thus lacks merit.

VOIR DIRE ISSUES

Improper granting of challenges for cause/ defendant's assignment of error number 6
In this assignment of error, defendant contends the trial court erred by granting three of the State's challenges for cause. These challenges were for prospective jurors Cuadra, Bossom, and Shropshire.
A prospective juror whose beliefs about capital punishment would "prevent or substantially impair him from making an impartial decision as a juror in accordance with his instructions and his oath" may be properly challenged for cause. La.C.Cr.P. art. 798(2)(b); see also Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (prospective juror is properly excused for cause when his views of the death penalty would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath"). Under the Sixth and Fourteenth Amendments, however, a prospective juror may not be properly excluded merely because he has stated general objections to the death penalty or has "expressed conscientious or religious scruples against its infliction." Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Rather, "[t]he exclusion of potential jurors must be limited to those who are `irrevocably committed ... to vote against the death penalty regardless of the facts and circumstances that might emerge in the course of the proceedings' and to those whose views prevent them from making an impartial decision on the question of guilt." State v. Sullivan, 596 So.2d 177 (La.1992), rev'd on other grounds 508 U.S. 275, 113 *174 S.Ct. 2078, 124 L.Ed.2d 182, quoting Witherspoon, 391 U.S. at 523 n. 21, 88 S.Ct. at 1777 n. 21; see also La.C.Cr.P. art. 798(2)(a) (juror who would automatically vote against death penalty may be properly challenged for cause). The improper exclusion of such a prospective juror constitutes reversible error even when the State could have used a peremptory challenge to strike the prospective juror. State v. Gradley, 97-0641 (La.5/19/98), ___ So.2d ___, 1998 WL 252461, citing Gray v. Mississippi, 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987).
Additionally, a prospective juror is properly challenged for cause when he is "not impartial, whatever the cause of his partiality." La.C.Cr.P. art. 797(2).
The trial judge, however, has great discretion in ruling on challenges for cause, and these determinations are entitled to great deference, provided they are fairly supported by the record. State v. Frost, 97-1771 (La.12/1/98), 727 So.2d 417; State v. Gradley, 97-0641 (La.12/1/98), ___ So.2d ___. Accordingly, these rulings will not be disturbed on appeal unless an examination of the voir dire as a whole shows an abuse of this great discretion. Frost, 97-1771 at 3; 727 So.2d at 423; State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116.

Prospective juror Cuadra
Cuadra was challenged after the defense challenged prospective juror Felps on the basis that she remembered details about the evidence to be presented, had discussed the case with fellow employees, some of whom knew the individuals who operated the restaurant where the crime took place, and had already formed an opinion about defendant's guilt. The prosecutor then responded that it seemed inconsistent that the defense would challenge Felps and not Cuadra, who remembered substantially more about the case than did most of the other prospective jurors. The court then granted the challenge of Felps, and the State moved to challenge Cuadra on the basis of his pretrial media exposure to the case.[6] The State and defense also accused each other of challenging Cuadra and Felps, respectively, based on the prospective jurors' feelings about the death penalty. Both challenges were granted, and each attorney objected to the granting of the other's challenge.
The record shows that Cuadra, who lived two miles from the restaurant at the time of the crime, had frequently gone there prior to the murders. The record also shows that although Cuadra denied having an opinion as to the defendant's guilt, he did remember more details of the crime than did most other prospective jurors. Specifically, Cuadra remembered:
[H]earing about how one of the victims pled for her life to be spared and then how she managed to reach the phone and dialed 911. I remember about the cook, how he got shot in the head and the bartender who survived.... I remember seeing some of the waitresses gather around the Calendar's restaurants, some of them weeping. That's what I remember seeing.
This knowledge had made Cuadra "feel sorry for her [Guzzardo] and her family, upset, depressed." When Cuadra learned the defendant was arrested, he was "relieved that a suspect was in custody" due to the proximity of his home to the crime scene.
Cuadra had also watched a news broadcast about the case that was aired on the Sunday before voir dire began. This broadcast was the one that mentioned the "rap music" defense. Cuadra remembered hearing of this defense, and he knew its premise.
*175 Given both the extent of Cuadra's knowledge of the case and the proximity of his home to the scene of the crime, we cannot say that the trial court abused its vast discretion in granting the State's challenge for cause as to this prospective juror, as these factors might well have rendered Cuadra impartial.
This assignment of error thus lacks merit as to prospective juror Cuadra.

Prospective juror Bossom
Defendant next asserts that prospective juror Bossom was improperly struck based on her views on the death penalty. Defendant bases this argument on the following colloquies between the attorneys and Bossom:
Q. Do you come under that category that I described who are people that philosophically believe in the death penalty, but they personally would not want to be associated with personally returning a verdict that would result in someone actually being put to death by lethal injection?
A. Yes.
Q. Okay. And you think those feelings could impair your ability to return a death penalty?
A. It would depend upon the evidence that was produced.
Q. If you listen to all the evidence and everything is sojust thejust blatantly horrible, terrible, double murder, and the defense didn't give you any reason not to kill Todd Wessinger, can you consider the death penalty?
A. Yes.
Q. Yes?
A. Yes.
These excerpts do not, however, accurately portray Bossom's attitudes, as they do not reveal the obvious reservations that Bossom had about her ability to return the death penalty. In her juror questionnaire, Bossom stated that she hoped she would never have to make a decision regarding someone's life. During questioning, she reiterated that she hoped she "would not be the one that would have to make a decision regarding someone's longevity." The following excerpts also reveal this reluctance:
A. I don't think the number of people [victims] is the determining factor. (In whether she could give the death penalty.)
Q. What would be the determining factor for you?
A. I don't know that I could vote for the death penalty. I don't know that I would not, but I don't know that I could.
Q.... You do have some reservations about whether or not you could return a death penalty in a case of this type; is that correct?
A. Yes.
Q. And that could that could impair your ability to return a death penalty?
A. Possibly.
Q. And you personally would have a problem with being responsible for this defendant being put to death by a lethal injection at some future date?
A. Yes.
Q. And those feelings,___ extraneous of the evidence, those feelings could ___ and I use the words "could impair your ability to return a death penalty"?
A. Possibly, yes.
Q. When you say "possibly, yes", you believe they could, don't you?
A. Yes.
Q. Maybe I'm wrong, and I hope I am, but you appear to be a little apprehensive about answering questions. Maybe you are not too thrilled to be here. Am I wrong?
A. No. I'm very apprehensive about the questions that you're asking me.
Q. Okay. Why is that?
A. Because of my uncertainty and what's being asked of me.
Q. In answer to some of Mr. Sinquefield's questions, he saidyou said you thought you might be impaired in bringing *176 back a death penalty. What did you mean by that?
A. That I'm for the opinion to choose not to judge others.
Q.... And you felt that Bill Hecker is all wet and his client should be put to death, could you do that?
A. I don't know.
The State's challenge was granted, and the defense objected.
Reviewing all of these excerpts, we cannot say that the trial court abused its discretion on granting the challenge. Bossom's obvious discomfort at the mere thought of possibly having to consider imposing the death penalty on another human being shows that her beliefs could indeed "substantially impair" her from fulfilling her duties as a juror should she have to choose between the death penalty or life in prison.
We additionally note that Bossom admitted that she would have a problem with a defendant who did not testify on his own behalf:
Q. Well, what kind of problems would you have?
A. The fact that I believe an innocent person would have no qualms about admitting or
Q. About getting up there and testifying?
A. Saying that I'm innocent.
Q. Okay.
A. And saying why I'm innocent.
Q. If you were instructed by the judge that you had to put that aside, do you think you could do that, or do you think that would prejudice you?
A. I think it's a feeling that would remain.
Q. You think it would remain?
A. Yes.
Q. Even if you took an oath as a juror, you think you still would have some problems with that?
A. Very possibly, yes.
Given this further evidence of Bossom's inability to respect defendant's Fifth Amendment right to refuse to testify, we certainly cannot say the trial judge erred in granting this challenge for cause.
This assignment of error thus lacks merit as to prospective juror Bossom.

Prospective juror Shropshire
Finally, defendant contends the trial court improperly granted the State's challenge for cause based on prospective juror Shropshire's views on the death penalty. In support of this argument, he cites the following excerpts:
Q. Would it be fair to say that you would have to listen to the evidence that the state would have to see whether or not you could give capital punishment in a case?
A. Correct.
Q. If you felt in your heart as a citizen of East Baton Rouge Parish that the State of Louisiana has proved to you, you believe, in your heart, in your soul, that the only proper penalty because of the evidence that was presented to you could you vote that penalty if you felt that the only proper penalty is death? Could you vote back in the jury room for death?
A. Well, if it's proven with enough evidence.
Q. If they have enough evidence?
A. If they have the evidence.
Q. Mr. Shropshire, when you told me that you couldn't return a capital punishment verdict against this defendant you were telling me the truth, weren't you?
A. I was telling you the truth.
Q. You could not, could you?
A. If there's enough evidence.
Q. Could you no matter what evidence, could you personally give a verdict that would mean that this defendant was lethally injected and out to death?
A. Well, I don't agree on it.
Q. You don't believe you could?
A. No, sir.

*177 Q. You believe you have reservations that were substantial enough that it could impair you from being able to give him capital punishment?
A. Well, if enough evidence prevailed maybe' I could change my plea, you know, but under the circumstances.
Q. But you really don't believe in the death penalty, do you?
A. I don't believe in the death penalty.
Q. Thoseyour belief against the death penalty could interfere with your being totally fair on the death penalty?
A. That's true.
We note initially that this last exchange plainly shows how Shropshire's views of the death penalty could "substantially impair" his ability to make an impartial decision in accordance with his duties and oath as a juror, as he frankly admitted that these views could prevent him from being totally fair on this issue. This was not, however, the only exchange in which Shropshire's personal views about the death penalty became obvious. Shropshire failed to fill out the last two pages of the jury questionnaire, which included a question on the respondent's feelings about the death penalty. When asked how he would have answered this question, the following exchange ensued:
A. Well, I don't believe in capital punishment, for one thing.
Q. I'm sorry?
A. I don't believe in capital punishment, for one thing.
Q. Is this a truly held belief? It's not just a ploy to get out of jury service?
A. No, sir. No, sir, It's true.
Q. Is it a strongly held belief?
A. Strong, yes.
Q. So you could not return a death verdict against this defendant?
A. Well, I don't believe in capital punishment.
Q. Okay. You couldn't return a capital punishment against this defendant, then; is that correct, sir?
A. That's correct.
Q. Not under any circumstances?
A. Not under any circumstances.
Later, although admitting that he could give the death penalty to Timothy McVeigh, Shropshire maintained that, in this particular case, the most he could give this particular defendant was "life in prison or something like that." Shropshire then reiterated that "I still say I don't believe in capital punishment." The trial court granted the State's challenge, and the defense lodged an objection.
After reviewing the entire record of the voir dire examination of Shropshire, we cannot say the trial court abused its discretion in granting the challenge. Although a few of Shropshire's answers, when read in isolation from the remainder of his examination, paint him as an acceptable juror, the record when read as a whole shows that he adamantly believed capital punishment was wrong and that these beliefs prevented him from being an impartial juror.
This assignment of error thus lacks merit as to prospective juror Shropshire.

Unconstitutional religious discrimination
Finally, defendant asserts in a footnote of his brief that certain jurors were successfully challenged for cause in violation of their federal and state constitutional rights to freedom of religious beliefs. As we held in State v. Sanders, 93-0001 (La.11/30/94), 648 So.2d 1272, this argument fails for two reasons:
First, [defendant] has not even argued (much less shown) that the alleged discrimination the two jurors suffered actually constitutes religious discrimination. The record shows the inquiry was restricted to the question of whether the veniremen could vote for the death penalty. As this court has held, the "single attitude" of opposition to the death penalty "does not represent the kind of... religious ... characteristic that underlies those groups that have been recognized *178 as being distinctive." State v. Lowenfield, 495 So.2d 1245, 1254 (La. 1985).
Second, even if reluctance to impose the death penalty were religious in nature, this court has adopted the Witherspoon and Witt standards. This court has on numerous occasions reviewed the disqualification of jurors who stated a religious basis for their inability to impose the death penalty, and has in no instance found a constitutional violation. See, e.g. State v. Sullivan, 596 So.2d 177 (La. 1992); State v. Copeland, 530 So.2d 526 (La.1988); State v. Ward, 483 So.2d 578 (La.1986); Lowenfield, 495 So.2d at 1254.
This assignment of error thus lacks merit as to those prospective jurors who allegedly were struck because their religious beliefs precluded them from imposing the death penalty.

Improper denial of challenges for cause/ defendant's assignment of error number 7
In this assignment of error, the defendant contends the trial court erred by denying his challenges for cause as to seven jurors.
The trial judge's incorrect ruling that deprives a defendant of one of his peremptory challenges is a substantial violation of a statutory or constitutional right and dictates reversal of the conviction and sentence. State v. Bourque, 622 So.2d 198, 225 (La.1993), overruled on other grounds by State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16, citing State v. McIntyre, 365 So.2d 1348, 1351 (La.1978). For a defendant to successfully prevail on a claim that he was deprived of one of his peremptory challenges due to the trial judge's erroneous ruling on his challenge for cause, he must show: (1) his challenge for cause was improperly denied; and (2) he has used all of his peremptory challenges. State v. Cross, 93-1189 (La.6/30/95), 658 So.2d 683; Bourque, 622 So.2d at 225.
Defendant's peremptory challenge sheet, which is part of the record, shows that he exercised only eight of the twelve peremptory challenges that he is given by La. C.Cr.P. art. 799. Thus, we are not required to reach the issue of whether the trial judge erroneously denied the challenges for cause that are the subject of this assignment of error. See, e.g. State v. Koon, 96-1208 (La.5/20/97), 704 So.2d 756, cert denied ___ U.S. ___, 118 S.Ct. 570, ___ L.Ed.2d ___ ( "we need not reach the issue of whether the failure to dismiss [prospective juror] Ms. Myers for cause was error because the defense did not use all its peremptory challenges"); State v. Mitchell, 94-2078 (La.5/21/96), 674 So.2d 250 ("In the instant case, we need not reach the issue of whether there was an erroneous denial of defendant's challenge for cause, since the record reveals that defendant failed to use all his peremptory challenges.").
This assignment of error thus lacks merit.

GUILT PHASE ISSUES

Hearsay/ defendant's assignment of error number 10
In this assignment of error, the defendant contends the trial court erred by admitting hearsay during the guilt phase of the trial. Specifically, defendant complains of the admission of the arrest warrant that was taken out on him and the search warrants for his mother's house and the abandoned house from which the murder weapon was retrieved. He also complains of hearsay statements by Willie Grigsby, Sgt. Crawford Wheeler, and Detective Bates. These alleged hearsay statements and the warrants were not the subjects of contemporaneous objections at trial and thus are precluded from review by State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364.
This assignment of error thus lacks merit.

Gruesome photographs/ defendant's assignment of error number 11
In this assignment of error, the defendant contends the trial court erroneously *179 admitted gruesome autopsy photographs into evidence. Defendant argued in a pre-trial motion that the probative value of the photos was outweighed by their prejudicial effect.
Post-mortem photographs of murder victims are usually admissible to show the location, number, and severity of the wounds, prove corpus delecti, establish the victim's identity, and to corroborate any other evidence of the manner of death. State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8; State v. Koon, 96-1208 (La.5/20/97), 704 So.2d 756; State v. Maxie, 93-2158 (La.4/10/95), 653 So.2d 526; State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190. Further, the State is entitled to the moral weight of its evidence. Robertson, 712 So.2d at 32. Photographic evidence will be admitted unless it is so gruesome as to overwhelm the jurors' reason and lead them to convict defendant absent other sufficient evidence. Robertson, 712 So.2d at 32; Maxie, 653 So.2d at 533; State v. Perry, 502 So.2d 543, 558 (La.1986) cert denied, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987).
In the instant case, the photos at issue are not overly gruesome. They are, however, relevant to show the manner of death, the location of the victims' wounds, and the angle of entry of the bullets. The defendant does not show, and we cannot ascertain from the record, how the probative value of these photos is outweighed by their prejudicial effect.
This assignment of error thus lacks merit.

Improper argument/ defendant's assignment of error number 12
In this assignment of error, defendant contends reversible error was committed when the prosecutor "made endless references to his own personal opinion" and "went into a long monologue about what he thought and why he acted in a particular way." Review of this claim, however, is precluded under Taylor, as there were no contemporaneous objections to any of the disputed statements.
This assignment of error thus lacks merit.

Improper jury instructions/ defendant's assignment of error number 13
In this assignment of error, defendant contends that several jury instructions were erroneous. None of these alleged errors were preserved for review with contemporary objections. Thus, they are precluded from review under Taylor.
This assignment of error thus lacks merit.

PENALTY PHASE ISSUES

Prosecutorial misconduct/ defendant's assignment of error number 1

Scope of Review
In this assignment of error, defendant contends that several acts of prosecutorial misconduct mandate the reversal of his sentence. We note initially that several of these allegedly improper acts were not objected to at trial. Indeed, defendant not only failed to object to, but actually affirmatively acquiesced in, the admission of testimony about prison life at Angola.[7] In diametric opposition to his position at trial, defendant now strenuously argues that this evidence was erroneously admitted. This case thus leads us to believe we should reexamine our previous holdings addressing the contemporaneous objection requirement of La.C.Cr.P. art. 841 as applied to the penalty phase of capital trials.
Under La.C.Cr.P. art. 841, "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." In State v. Smith, 554 So.2d 676 (La.1989), we examined the application of this "contemporaneous objection *180 rule" in death penalty cases and concluded that we would "notice all possible errors even though not properly raised," noting that "[i]n a case involving capital punishment anything less than this court's careful consideration of the entire record for possible prejudicial error would not afford `an adequate remedy by due process of law and justice.'" Smith, 554 So.2d at 678, quoting La Const. art. I, Sec. 22. The Smith court was also motivated by concerns about judicial efficiency, believing that the failure to review alleged guilt phase errors that were not the subject of a contemporaneous objection would contribute "to the burgeoning delay of postconviction proceedings in state and federal courts." Smith, 554 So.2d at 678. Thus, motivated by concerns for both the rights of the accused and judicial efficiency, Smith abrogated the legislatively imposed contemporaneous objection rule in capital cases.
We reexamined our Smith holding in State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364. We noted in Taylor that subsequent events, most notably the establishment of the Louisiana Indigent Defender Board (LIBD) pursuant to La.Sup.Ct.R. XXXI, had alleviated the concerns that buttressed our holding in Smith. Specifically, La.Sup.Ct.R. XXXI, in addition to setting up the LIDB, also mandated the appointment of no fewer than two attorneys in capital cases. Further, attorneys must meet certain guidelines in terms of experience before they may be appointed to represent a capital defendant. Finding that "[w]ith able counsel at the helm, most significant errors occurring during the guilt phase should be contemporaneously objected to as required by La.Code Crim.P. art. 841(A)," we reinstated the contemporaneous objection requirement in the guilt phase of capital trials.
Turning now to whether we should extend Taylor to the penalty phase of capital trials, we first note that there are two related and equally sound policies behind the contemporaneous objection rule. First, the rule brings the error to the trial judge's attention and affords him an opportunity to correct it "before it infect[s] the entire proceeding." State v. Potter, 591 So.2d 1166, 1169 (La.1991); see also State v. Arvie, 505 So.2d 44 (La.1987); State v. Knapper, 458 So.2d 1284 (La. 1984). Second, the rule "is specifically designed to promote judicial efficiency by preventing a defendant from gambling for a favorable verdict, and then, upon conviction, resorting to appeal on errors which either could have been avoided or corrected at the time or should have put an immediate halt to the proceedings." Taylor, 669 So.2d at 368; see also Knapper, 458 So.2d at 1287, n. 3. We find that these policies are equally as applicable to the penalty phase of a capital trial as they are to the guilt phase. A contemporaneous objection to an error occurring during the penalty phase of a capital trial will either allow the trial judge to correct the error before it "infects" the entire penalty phase or, in the case of a serious error, allow the judge to immediately stop the proceedings and immediately give the defendant a new penalty phase, free of the error, rather than make the accused go through the entire, contaminated penalty phase, and then go through yet another penalty phase after appeal.
We further find that the Taylor rationale for applying the contemporaneous objection requirement to the guilt phase of a capital trial is equally valid in the penalty phase, as the able counsel that are now available to the criminal accused through the LIDB should have no problem recognizing and lodging contemporaneous objections to reversible errors.[8]
Additionally, there are more than ample safeguards to assure that the failure of defense counsel to object to a reversible error will not condemn the defendant to an unjust execution. This court has an independent *181 duty under article I, section 20 of the Louisiana Constitution of 1974, La. C.Cr.P. art. 905.9, and La.Sup.Ct.R. 28 to determine whether the sentence imposed is constitutionally excessive. This is done by carefully examining the record for evidence of passion, prejudice, or arbitrary factors that could have caused the death penalty to be imposed. In the event that an error that warranted reversal was not objected to contemporaneously in the trial court, that error will be discovered during our mandatory direct review. Further, the failure to object to a valid error may be the proper subject of a postconviction claim of ineffective assistance of counsel.
Thus, both because all of the same policies that apply to requiring a contemporaneous objection in the guilt phase of a capital trial also apply to the penalty phase and because the rights of the accused are still protected regardless of the application of the contemporaneous objection rule, we hold that we will no longer consider alleged errors occurring in the penalty phase of a capital trial absent a contemporaneous objection. However, because we are mindful that this holding affects the meting out of the most serious sanction our society can impose, this holding will be strictly applied prospectively only. That is, we will only apply the contemporaneous objection rule to the penalty phase of those trials that begin after this decision is rendered. This rule will thus not apply to this case. We will now address the merits of defendant's arguments regarding alleged prosecutorial misconduct.

Victim impact testimony
Defendant's most ardent argument is that much of the State's victim impact testimony was erroneously admitted. Specifically, he argues that the testimony of two longtime friends of David Breakwell and two of Breakwell and Guzzardo's co-workers should not have been admitted. Defendant did not, however, object to this testimony during the penalty phase of his trial.
We have recently addressed this issue in State v. Frost, 97-1771 (La.12/1/98), 727 So.2d 417. In Frost, we held that victim impact testimony from persons other than family members of the victim is indeed improper, as La.C.Cr.P. art. 905.2(A) specifically provides:
The sentencing hearing shall focus on the circumstances of the offense, the character and propensities of the offender, and the impact that the death of the victim has had on family members. (Emph. added.)
However, the mere admission of this testimony does not per se require reversal. Rather, the admission of this testimony is subject to the harmless error standard. Frost, 97-1771 at 10, 727 So.2d 430. In Frost, we found that the admission of testimony from non-familial witnesses that would have been proper testimony from family witnesses was harmless error.
The State concedes in brief that the admission of victim impact testimony from the friends and co-workers of the victim was improper under Frost. Because these individuals were not family of the victims under either a traditional or legal definition of the word, the testimony of these witnesses was indeed erroneously admitted.[9] The inquiry then becomes whether this testimony would have been proper had the witnesses been family witnesses.
In State v. Bernard, 608 So.2d 966 (La. 1992), we held that the State "may introduce a limited amount of general evidence providing identity to the victim and a limited amount of general evidence demonstrating harm to the victim's survivors." Bernard, 608 So.2d at 972. We cautioned, however, that "the more detailed the evidence relating to the character of the victim *182 or the harm to the survivors, the less relevant is such evidence." Id. Also forbidden are "detailed descriptions of the good qualities of the victim or particularized narrations of the emotional, psychological, and economic sufferings of the victim's survivors." Id.
In the instant case, the record shows that Barbara Magetis, Janice Bonnecaze, Karen Sikes, and Kathy Goodson, although not family members of the victims, were offered as victim impact witnesses.
Magetis was Breakwell's neighbor for 15 years. She testified that he was her friend, and that he was a good, generous, kind, caring person who was concerned about her children. She also testified that she had no relatives who lived in the state and considered Breakwell to be a member of her extended family. She stated that losing him was like losing a family member, and it was hard to drive by his house. Magetis' testimony comprises 3 pages of the 187 page penalty phase record.[10]
Bonnecaze had been a friend of Breakwell's for approximately 13 years. She described him as warm and witty with a quick laugh, and a wonderful person to be around. She regretted not visiting him the day before he was murdered. She missed him and always would miss him. Her testimony totaled 2 pages.
Sikes was a co-worker of both Breakwell and Guzzardo. She described Breakwell as an effervescent person who helped out everyone he worked with, and who had been especially helpful to her when she first started working at the restaurant. She also stated that Guzzardo was one of her best friends, and she described Guzzardo as amazing, positive, charming, and sweet. She said she thought about the victims' deaths every day, and she would never get over the deaths. Sikes' testimony comprised 2 pages of the record.
Goodson was also a co-worker of both victims. She testified as to how Breakwell had taken her under his wing when she first started at the restaurant, and she described him as a good person. Goodson also described Guzzardo as "the nicest person you could meet," and she said she would never get over the victims' deaths. Her testimony was 2 pages long.
These witness' testimony, although comprising approximately slightly over one-half of the State's victim impact evidence, also constitutes a mere 9 of the 131 pages of testimony at the penalty phase of trial.[11] Further, the substance of these witnesses' testimony was squarely within the scope of Bernard, as the witnesses gave only general descriptions of the victims' character and their own suffering at the loss of the victims. There were no detailed descriptions or particularized narratives of either the victims' good qualities or the witnesses' own suffering. Further, the trial judge properly instructed the jury on the weight to be given victim impact testimony.[12] Thus, the admission of these witnesses' testimony, although certainly erroneous, constituted harmless error.
This assignment of error thus lacks merit as to the introduction of victim impact testimony from non-family witnesses.

Highly emotional testimony
Defendant next contends that the testimony of Guzzardo's parents was "highly emotional and prejudicial." Defendant *183 specifically argues that the statements of the Guzzardos that they had no sympathy for the defendant constitute error.
The record shows that the prosecutor did in fact ask each of the Guzzardos whether they had any sympathy for the defendant, and they both answered this question in the negative. Assuming without deciding that this testimony was improper under Bernard, we find that its admission was harmless.[13] As we noted in State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364:
[S]urely the jury regarded the testimony of these victim impact witnesses as normal human reactions to the death of a loved one. That the victim's survivors might have little or no sympathy for the defendant surely would come as no surprise to a member of the jury.
Especially in light of the credit that must be given to the good sense and fair-mindedness of jurors, we cannot say that the admission of these statements prejudiced defendant.
This assignment of error thus lacks merit as to the "no sympathy" statements.

Denial of mistrial
Defendant next contends the trial court erred when it declined to declare a mistrial when Mrs. Guzzardo broke out into tears after the victim's sweater was introduced into evidence and when there was an outburst in the courtroom after the tape of Guzzardo's 911 call was played for the jury.[14] The record shows that the jury was removed from the courtroom and a bench conference was held. The defendant then moved for a mistrial, which was denied; attorneys for both sides noted that emotional testimony had been heard throughout the entire penalty phase. The prosecutor also offered to exclude the Guzzardos, but the defense declined this offer.
"Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct inside or outside the courtroom makes it impossible for the defendant to obtain a fair trial." La.C.Cr.P. art. 775. Mistrial is a drastic remedy, and is warranted only when the defendant has suffered substantial prejudice such that he cannot receive a fair trial. State v. Bates, 495 So.2d 1262 (La.1986); State v. Wingo, 457 So.2d 1159 (La.1984). The determination of whether actual prejudice has occurred, and thus whether a mistrial is warranted, lies within the sound discretion of the trial judge, and this decision will not be overturned on appeal absent an abuse of that discretion. State v. Sanders, 93-0001 (La.11/30/94), 648 So.2d 1272; Wingo, 457 So.2d at 1166.
We cannot say that the trial judge abused his vast discretion in denying the mistrial at issue in this assignment of error. Defendant does not demonstrate, and we cannot ascertain from the record, how these outbursts could have prejudiced him to such a degree that a mistrial was warranted. Again, we must credit the jurors with the good sense and fair-mindedness to see these outbursts for what they were, the natural and irrelevant expression of human emotion, and not let the outbursts influence their decision on defendant's penalty.
This assignment of error thus lacks merit as to these outbursts.

Improper commutation evidence
In this assignment of error, defendant contends that the prosecutor improperly elicited "evidence that a death sentence should be imposed to save the victims' family [sic] and friends from having to attend commutation hearings for the rest of their lives."
*184 The testimony at issue in this assignment of error occurred during the cross-examination of Dean Burke Foster, the defendant's expert in "executive clemency and correction," in accordance with La. C.Cr.P. art. 905.2(B), which allows a defendant to provide evidence on the frequency and extent to which the governor has used his pardon and commutation power.[15] To this end, the defendant questioned Foster extensively. Foster gave statistical testimony about the number of convicted first-degree murderers in the prison system, how many of those people had their sentences commuted, and, of those commuted, the number who were released from prison. The expert was also questioned about the number of sentences commuted by Governor Mike Foster, and he testified that no one convicted of two counts of first degree murder had ever had his or her sentence commuted. All of Foster's statistical testimony, however, was based on events occurring after 1973, when Louisiana's first degree murder statute was enacted.
Foster further testified:
Q. And if the judgeif the jury would recommend a life sentence as opposed to a death sentence, would youwould it be fair to say that you think Todd Wessinger would be sent to Angola as a double murderer, a twice-convicted first degree murderer?
A. He would surely go to Angola. Angola is a lifers' prisoner [sic]. Over half the inmates there are serving life sentences. That is where he would go if convicted of two counts of first-degree murder. There is no doubt about that.
Q. Don't people get out of Angola? Aren't they commuted out of Angola? Aren't they paroled out of Angola?
A. Some people get out of Angola, but lifers don't get out of Angola because lifers are not eligible to leave prison. A life sentence in Louisiana means a natural life sentence, so if he is given life imprisonment, he will spend the rest of his life in prison at Angola. (Emph.added.)
On cross-examination, Foster doggedly refused to retreat from his assertion that defendant, if given a life sentence, would live out the rest of his years at Angola. Foster further asserted that, given the political climate of the state, defendant, if given a life sentence, would not get that sentence commuted. After being questioned about commutations prior to 1973, when a life sentence could be commuted to ten and a half years, Foster testified during cross-examination:
Q. And you cannot tell this jury, you can tell statistics, but you cannot tell this jury Mike Foster will be the governor past another two and a half years, can you?
A. No, sir, but you know the political climate that governors operate in now is much different from what it used to be. The pardon board simply doesn't do things it used to do and governors don't do things they used to.
Q. That is what we are saying. We hope those times don't come back, but you cannot guarantee them, can you, professor?

*185 A. The trend has been very definitely in one direction, and you can pretty much guarantee it because no governor or pardon board is going back to the days when they turned lifers lose after ten and a half years.
The prosecutor also questioned Foster about a murderer who had been paroled by Buddy Roemer and subsequently committed another murder, yet Foster still refused to let go of his assertion that defendant, if given a life sentence, could never get out of prison. Finally, the prosecutor questioned Foster about pardon board hearings:
Q. I call it commutation hearings. I take the correction there. I have been there on commutations. But let me ask you this. They can apply how often?
A. They can apply, if they are rejected, every two years.
Q. How do they come up every six months?
A. They can't come up every six months.
Q. Can't?
A. No, the law provides the rule
Q. So every two years, the victims' families have to go down there and face a hearing and they have to testify and tell what happened to their loved ones, don't they?
A. No, sir. The pardon boardyou are only entitled to one pardon board hearing. Anything after that is discretionary. They don't have to approve your application when you ask.
Q. How many times has Billy Wayne Sinclair been up there?
A. I couldn't tell you about that character.
Q. How many times has Wilbert Rideauhow many times have those families had to go up there? You're the expert. Tell me. Those are the two most famous in Louisiana. You don't know how many times?
A. I have not kept up with how many times they have been before the pardon board.
Q. How many times have those families had to come from Lake Charles or Baton Rouge and go through what they go through? You don't know, do you?
A. That's not something I have researched, so I can't answer that question.
Q. It's hard on these families, isn't it?
A. It's hard on them, but that's required by law.
Q. Because they know what the uncertainty is to whether or not he's going to get commuted and get out, don't they? Don't they? (Emph.added.)
Defendant contends the last quoted excerpt of the cross-examination erroneously "invited the jury to sentence Mr. Wessinger to death to save his victims' families from having to oppose his commutation." We note initially that this testimony was in response to Foster's assertions about the certainty that defendant, if given a life sentence, would "spend the rest of his life at Angola," which testimony went astray from that which shows the "frequency and extent" of the governor's commutation power. We further note that this excerpt, when viewed in isolation, does seem to come very close to being erroneous.[16] However, when the transcript of Foster's testimony is read as a whole, it becomes apparent that this testimony was part of the proper scope of cross-examination, as the prosecutor was trying to make Foster retreat from his position of virtually guaranteeing the jury that defendant would never be commuted out of a life sentence. We also reiterate that we must give credit to the good sense and fairmindedness of the jurors, which qualities would surely prevent them from giving a man the death penalty merely to prevent *186 the victims' families from attending commutation hearings.
It must also be noted that the prosecutor, in his closing argument, impressed upon the jury that they were not to use the pardon board hearings as a reason to give the defendant the death penalty:
They called an expert on commutation who testified aboutI think he said there have been 21 commutations of first degree murder since 1973 and 11 have gotten out. And I guess with that witnessI guess I was a little facetious, but I won't apologize for that because I don't believe anybody is a psychic. I don't think anybody can predict. When you have a statute that says the governor can commute any sentence to a set term of years, and he says absolutely it can never, never happen, then I don't have much respect for his opinion. But I am not arguing that because it doesn't make any difference. I am not arguing viz-a-viz life versus death, whether he gets out of whatever. What I am arguing to you is that in a crime of this nature, almost unparalleled in Baton Rouge, that he deserves the death penalty as punishment. That, based on this evidence, what you have seen in this courtroom, that that is the only acceptable punishment based on evidence where a person starts days in advance deciding that he's going to rob a place and execute everybody in there, and when he carries that plan out, that you reach a point where you have just gone too far and the maximum penalty, whatever it is in Louisiana, the death penalty, is certainly the only acceptable penalty based on that evidence of premeditated massacre for money. There wasn't any particular emergency. Did you see a precipitating factor? What they introduced was here is a guy with a good home. Here's a guy who had a job. Here's a guy who had a job with Coca-Cola. He had a place to sleep. He wasn't starving. None of his kids were in the hospital. There was no emergency. He didn't rob and kill Stephanie Guzzardo and shoot Mike Armentor and shoot and kill David Breakwell because of some emergency where he had to have money. He made a lifestyle and business decision that he wanted the money and executed two fine people and almost executed a third and tried to do a fourth. I think all that evidence is plain to you. So this commutation issue, don't get off on that because what you should consider is that because of the pain, misery, and suffering that he has caused, that he richly deserves the death penalty, and each and every one of you told me in voir dire that you believe in the death penalty, that this is the type of case, if I proved it, where you could return one, and I think after listening to everything that has been in evidence that you should agree that the evidence in this case demands that the only acceptable penalty would be a death penalty. (Emph.added.)
Finally, we note that there was no contemporaneous objection lodged to any of this testimony. While this does not preclude us from reviewing this assignment of error, defense counsel's lack of an objection does suggest that this testimony, contrary to its appearance in the cold record, was not as damaging as it may now seem. See State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, 375 n. 10 ("Under either the scope of review established in Smith or the limited scope of review to which we return today, the lack of an objection is a factor to be considered in examining the impact of a prosecutor's closing argument. Particularly, the lack of an objection demonstrates the defense counsels' belief that the live argument, despite its appearance in the cold record, was not overly damaging."). We thus find that this testimony was not erroneous under these particular circumstances. Further, even assuming arguendo that this testimony was erroneous, it was harmless error. Given the volume of evidence that the jury viewed, which evidence established both the callous nature of the crime and the *187 defendant's cold indifference to the value of human life, it seems that the penalty given to defendant was surely unattributable to the disputed testimony.
The defendant further argues that the testimony about the length of Gov. Foster's term and the testimony about Gov. Roemer were also erroneous. Again, this testimony was also within the proper scope of cross-examination, as it went to disproving Foster's assertion that defendant would never be released from Angola if he were given a life sentence.
These assignments of error thus lack merit.

Proportionality
Defendant next contends the prosecutor improperly "turn[ed] the commutation issue into a proportionality survey of those on death row." Defendant takes issue with the prosecutor's cross-examination of defense expert Ms. Thomas Hollins, an administrative specialist for the Louisiana Board of Pardons, who provided statistical evidence. Defendant specifically complains of the following exchange:
Q. How many convicted of first degree double murder got the death penalty?
A. Current statistics provide that 65 persons are presently serving death.
Q. That did double homicide?
A. I don't know if they all were double homicides. I know they were first degree murder convictions.
Q. So you cannot tell me how many people that have been convicted of double homicide have received the death penalty, can you?
A. No, sir.
Q, But there have been some?
A. I would imagine. I am not sure. I can only offer that it's 65 presently serving that sentence.
Again, defendant "opened the door" to this line of questioning when he questioned Hollins about the number of people convicted of two counts of first degree murder who had their sentences commuted, and this line of questioning was within the proper scope of cross-examination.
This assignment of error thus lacks merit.

Improper closing argument
Defendant next contends the prosecutor presented a "highly improper `golden rule'" argument in his closing, when he asked the jurors to put themselves in the position of Stephanie Guzzardo on the morning she was killed. Although defendant argues that this was a "golden rule" argument, an analysis of the record shows that this statement was in the context of the prosecutor's argument on the "heinous, atrocious cruel" aggravating circumstance. This part of the prosecutor's argument contended that, although Guzzardo may have died shortly after she was shot, the last minutes of her life were nonetheless filled with agony and terror, thus supporting the aggravating circumstance that was the subject of the argument.
Closing arguments "shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case." La.C.Cr.P. art. 774. Prosecutors, however, have great latitude in making closing arguments. State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364; State v. Sanders, 93-0001 (La.11/30/94), 648 So.2d 1272. Even when a closing argument is improper, there is no reversible error unless the reviewing court is thoroughly convinced that the remark "influenced the jury or contributed to the verdict." State v. Eaton, 524 So.2d 1194, 1208 (La.1988).
We are not so convinced in this case. Even assuming, arguendo, that the remark at issue went beyond argument and commentary on the evidence and was a request to the jury to give the defendant the same treatment he had given the victims, "an intelligent jury could not reasonably have believed that the prosecutor was urging them to disregard the law as given to it in the instructions of the trial judge." *188 State v. Monroe, 397 So.2d 1258 (La.1981) (finding that a "golden rule" argument, although improper, was not reversible error). Further, the jury was instructed by the judge that arguments of counsel were not evidence, and the prosecutor himself later reminded the jury that
anything [the defense attorney] says and anything that I say in closing argument is not evidence whatsoever, nothing that you have heard in the courtroom. Base your verdict 100 per cent just on what you have heard on the witness stand and on the evidence in the case and not on anything that [the defense attorney] and I say, not any opinions you may have inferred or any pleas. The rule is that arguments of counsel are not to be considered evidence whatsoever.
This assignment of error thus lacks merit.

Prison life references
Defendant next contends the prosecutor impermissibly "attempted to make out that life at Angola was a holiday camp." Defendant specifically alleges that the following cross-examination of his expert, Dean Foster, was improper:
Q. But down at Angola they still get three square meals a day, don't they?
A. They work-if they do what they're supposed to, they'll be fed and otherwise cared for.
Q. They are allowed recreation?
A. If they follow the rules.
Q. Prison rodeos?
A. No, not typically. They have a prison rodeo, but most inmates don't go to it or take part in it. The rodeo
Q. Do they get to play basketball?
A. The rodeo is for people off the prison grounds and not the inmates and
Q. Under federal guidelines
Although defendant contends this excerpt was error, he omits certain statements from defense trial counsel, which were made immediately after the above quoted passage:
Mr. Hecker: Wait, your honor. Can he finish his answer?
The Court: Let's [sic] him finish.
Mr. Hecker: And one thing. I had not gone into prison life. We will let Mr. Sinquefield go to that. We didn't bring that up on direct. Let the jury hear that. We are not trying to hide anything. (Emph.added.)
As can be shown from this excerpt, defense counsel explicitly encouraged the prosecutor to continue this line of questioning. As we said previously, although the lack of an objection does not preclude us from reviewing this assignment of error, this fact does suggest that this testimony seems more damaging in the cold record than it did in a live courtroom. We have previously found that prosecutorial argument that strayed into the privileges the defendant would have at Angola and that the victim would never again enjoy did not constitute reversible error. State v. Kyles, 513 So.2d 265 (La.1987). Similarly, we find that this testimony did not inject an arbitrary factor into the trial so as to warrant reversal. In light of the good sense and fairmindedness of the jurors, we find that the penalty imposed was surely unattributable to this evidence.
This assignment of error thus lacks merit as to the admission of testimony about prison life.

Referring to the jury's penalty decision as a "recommendation"
Defendant next contends the prosecutor attempted to lessen the jury's sense of responsibility for defendant's penalty by referring to their decision on defendant's sentence as a "recommendation."
Although the prosecutor (and defense counsel) did so refer to the jury's decision, it cannot seriously be contended that the jury did not understand the gravity of their duty and the finality of their decision, as this responsibility was impressed upon them several times. As early as voir dire, the prosecutor explicitly told the jury what would happen if they recommended a *189 death sentence. For example, one voir dire panel was informed:
Death in Louisiana is by lethal injection, that means that if the jury returns a verdict of death, that you should assume that some time in the future the defendant will be put to death by lethal injection, that means he will be secured or strapped to a gurney, which is a hospital-type bed, that hea needle will be placed in his arm and medical personnel or technicians will cause a solution of drugs to enter into his body which kills him dead. And I didn't mix [sic] any words when I told y'all that, did I? That's because I want you to understand that this is what the State is seeking, and you should assume that no matter what you've heard about the death penalty in Louisiana, no matter what you've heard about it in the United States, you should assume if you return a verdict of death, that at some future deathI mean, at some future date that this defendant will be put to death by lethal injection.
Each panel was similarly informed that their "recommendation" was, in fact, binding.
In addition to this graphic explanation of the consequences of a verdict of death, the trial judge informed the jury, prior to opening arguments in the penalty phase:
After the close of evidence, you will be again instructed to by the court as to the law regarding this phase of the trial, and it will be your duty whether the sentence in this matter should be life in prison without benefit of probation, parole, or suspension of sentence or death.
Further, the instructions given by the trial judge also instructed the jury as to their responsibility:
Ladies and gentlemen, having found the accused guilty of first degree murder, you must now determine whether he should be sentenced to death or life imprisonment without benefit of probation, parole, or suspension of sentence.... In reaching your decision regarding the sentence to be imposed ...
If you unanimously find beyond a reasonable doubt that an aggravating circumstance existed, you may consider imposing a sentence of death. However, the finding of an aggravating circumstance does not mean you must impose the sentence of death.
It is your responsibility, in accordance with the principles of law I have instructed you, to determine whether the defendant should be sentenced to death or life imprisonment without benefit of probation, parole, or suspension of sentence on each count. (Emph.added.)
In light of these admonitions, we are certain that the jury was properly informed of the seriousness and finality of their decision as to the defendant's punishment.
This assignment of error thus lacks merit as to defendant's contention that the prosecutor misled the jury as to the finality of their decision to impose the death sentence.

Evidence of mitigating circumstances
Defendant next contends the prosecutor impermissibly "misled the jury into thinking that they could not consider entirely proper evidence from defense witnesses." Specifically, defendant complains about the following excerpt:
The other friends and the other family members that testified on his behalf seemed very sincere to me. I am not going to argue against that. But that is not the basis from which we decide whether or not a person should receive a recommendation of a death sentence for the crime of two counts of first degree murder. It is not them that is [sic] on trial. They didn't do anything. He's the person that did it. He's the person that made the decision. He's the person who armed himself, and he's the person who executed the two people. And while some of his family and friends may testify, and certainly it's moving testimony, *190 that does not excuse, that does not reach the issue of what is the proper punishment for him for what he did. And you can look at that list of mitigating circumstances that the judge is going to pass out to you, and it does not say because he has family and friends to come and testify about him that he shouldn't receive the death penalty.
As noted earlier, prosecutors have wide latitude in making closing arguments, and the lack of evidence is within the proper scope of arguments. When read as a whole, the record shows that, in the excerpt quoted above, the prosecutor was permissibly arguing that a mitigating circumstance had not been proved.
This assignment of error thus lacks merit as to this portion of the closing argument.

Commutation instruction
Finally, defendant argues that the statute providing for the "commutation instruction," La.C.Cr.P. art. 905.2(B), is unconstitutional.[17] This argument has previously been rejected, and we reject it again in this case. See State v. Loyd, 96-1805 (La.2/13/97), 689 So.2d 1321, 1331 ("Louisiana's instruction is an even-handed one which accurately informs jurors that a death sentence as well as a life sentence remains subject to executive revision.").
This assignment of error thus lacks merit as to the constitutionality of the commutation statute.

Right to testify in one's own behalf/ defendant's assignment of error number 3
In this assignment of error, defendant contends he was deprived of his right to testify on his own behalf during the penalty phase of trial.
The right of the accused under the federal constitution to take the stand and testify on his own behalf is rooted in the due process clause of the Fourteenth Amendment, the compulsory process clause of the Sixth Amendment, and the Fifth Amendment's guarantee against compelled testimony. See Rock v. Arkansas, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). Article I, § 16 of the Louisiana constitution also preserves this right.
In the instant case, the record indicates that a bench conference was held immediately after the defendant's mother testified. Defense counsel then informed the court that defendant wished to take the stand, against strong advice of both counsel and his psychological experts, and that he would be the last defense witness. The prosecutor then suggested that defense counsel take a recess after the next three witnesses, but before defendant was to take the stand, and then make his decision. Defense counsel agreed to this, thus implying the decision was not final. After the three witnesses testified, defense counsel indicated he needed a recess, which was given to him. After the recess, the defense rested. Defendant neither testified nor indicated a desire to do so after this recess. Nothing in the record indicates that either the State or the court prevented defendant from testifying. Rather, it seems that defendant changed his mind and chose not to testify.
This assignment of error thus lacks merit.

Right to be present in court/ defendant's assignment of error number 4
In this assignment of error, defendant contends he was improperly removed from the courtroom after the Guzzardos *191 had an outburst in the courtroom, when defense counsel argued for a mistrial during a bench conference.[18]
Louisiana Code of Criminal Procedure article 831, which governs the presence in the courtroom of one who is accused of a felony, provides:
A. Except as may be provided by local rules of court in accordance with Articles 522 and 551, a defendant charged with a felony shall be present:
(1) At arraignment;
(2) When a plea of guilty, not guilty, or not guilty and not guilty by reason of insanity is made;
(3) At the calling, examination, challenging, impanelling, and swearing of the jury, and at any subsequent proceedings for the discharge of the jury or of a juror;
(4) At all times during the trial when the court is determining and ruling on the admissibility of evidence;
(5) In trials by jury, at all proceedings when the jury is present, and in trials without a jury, at all times when evidence is being adduced; and
(6) At the rendition of the verdict or judgment, unless he voluntarily absents himself.
B. Nothing in this article shall prohibit the court, by local rule, from providing for a defendant's appearance at his arraignment by simultaneous audio-visual transmission, except when the defense counsel requests the defendant's appearance in open court.
On the other hand, La.C.Cr.P. art. 834 governs those instances when an accused's presence in the courtroom is unnecessary:
The defendant has a right to be present, but his presence is not essential to the validity of any of the following proceedings in a criminal prosecution:
(1) The making, hearing of, or ruling on a preliminary motion or application addressed to the court;
(2) The making, hearing of, or ruling on a motion or application addressed to the court during the trial when the jury is not present; except as provided in Clause (4) of Article 831; and
(3) The making, hearing of, or ruling on a motion or application made after his conviction.
The record shows that defendant was indeed removed from the courtroom during the bench conference at which the mistrial was argued, as was the jury. However, it seems that the defendant's presence in the courtroom at this time was unnecessary, as the proceeding from which he was excluded was not an arraignment, plea, juror proceeding, rendition of judgment, or a determination of the admissibility of evidence, nor was the jury present during this argument. The proceeding was, however, a ruling on a motion in accordance with La.C.Cr.P. art. 834(2). Further, as we have previously held in State v. Kahey, 436 So.2d 475 (La.1983):
Presence of the defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only. Therefore, the presence of the defendant is only essential at proceedings which have a reasonably substantial relation to the fullness of the opportunity of the defendant to defend against the charge. Snyder v. Commonwealth of Massachusetts, 291 So.2d[U.S] 97, 54 S.Ct. 330, 78 L.Ed.2d[L.Ed.] 674 (1934). From this principle has emerged the general rule that no claim of error, or at least no claim of prejudicial error, can be based upon the exclusion or absence of a defendant, pending his trial on a criminal charge, from the courtroom, or from a conference between court and attorneys, during argument on or discussion of a question of law. (Citations omitted.)
Consequently, defendant's presence in the court was unnecessary at that time, as the discussion of the mistrial was not substantially *192 related to his opportunity to defend against the charge of two counts of first degree murder, and his attorneys were arguing on whether the legal requirements for a mistrial had been met.
This assignment of error thus lacks merit.

Unconstitutional application of aggravating circumstances/ defendant's assignment of error number 14

Heinousness factor
Defendant first argues that the "heinous, atrocious, cruel" factor does not apply to this case, as it was not supported by the evidence.
We note initially that whether this factor was supported by the evidence was a question for the jury to decide. However, even assuming arguendo that this aggravating circumstance was improperly submitted to the jury, it did not inject an arbitrary factor into the proceedings. The trial court properly instructed the jury on this circumstance:
In order for you to find the offense was committed in an especially heinous, atrocious, or cruel manner, there must exist evidence from which you can find beyond a reasonable doubt that there was torture, or the pitiless unnecessary infliction of pain on the victims.
Further, even if this instruction were improper, the failure of one aggravating circumstance does not invalidate others. State v. Connolly, 96-1680 p. 17 (La.7/1/97), 700 So.2d 810, 822; State v. Welcome, 458 So.2d 1235, 1245 (La.1983). Finally, the evidence introduced in support of this circumstance did not inject an arbitrary factor into the penalty phase, as the evidence presented by the State during the guilt phase had already fully informed the jury of the circumstances of the victims' deaths. Accordingly, reintroduction of this evidence at the penalty phase did not interject an arbitrary factor into the penalty phase. See La.C.Cr.P. art. 905.2(A) ("the jury may consider [at sentencing] any evidence offered at trial on the issue of guilt.").
This assignment of error thus lacks merit as to the "heinous" aggravating circumstance.

Felony aggravating circumstance
Defendant next re-urges his argument that the aggravating circumstance of the murders having been committed during a burglary or robbery was erroneous. As discussed in the portion of this opinion addressing defendant's assignment of error number 13, this instruction was properly submitted to the jury.
This assignment of error thus lacks merit.

Improper penalty phase instructions/ defendant's assignment of error number 15
In this assignment of error, defendant contends the trial court made numerous errors in instructing the jury during the penalty phase.

Presumption of life
Defendant first contends the trial judge failed to instruct the jury that there is a presumption in favor of a life sentence. Because there is no such presumption in the law, the trial judge was correct in not so instructing the jury. State v. Langley, 95-1489 (La.4/14/98), 711 So.2d 651, 667.
This assignment of error thus lacks merit as to the "presumption of life."

Defendant's family and friends
Defendant next contends the trial court erred when by instructing the jury in such a way as to leave no "room for the jurors to consider the impact" of defendant's execution on his friends and family. Specifically, defendant first complains the trial court told the jury, at the start of the penalty phase:
The focus of this hearing is the circumstances of the offense, the character and propensities of the defendant, and the impact that the death of the victims had on the families.
This statement does no more than recite the law in accordance with La.C.Cr.P. art. *193 905.2(A) and thus is not erroneous. Further, the trial judge instructed the jury that:
In addition to those specifically provided mitigating circumstances, you must also consider any other relevant mitigating circumstance. You are not limited to only those mitigating circumstances which are defined. You may consider any other relevant circumstance which you feel should mitigate the severity of the penalty to be imposed.
This general charge adequately informed the jurors that they were free to consider any factors, including the testimony of defendant's friends and family, in determining the penalty to be imposed.
This assignment of error thus lacks merit as to the instructions on mitigating circumstances.

Individual consideration of mitigating factors
Defendant next contends that the jurors should have been instructed that, although their decision on aggravating circumstances had to be unanimous, their decision on mitigating circumstances had no such requirement. Defendant cites Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) in support of this proposition. Mills, however, is both inapposite and distinguishable from the instant case, as the instructions in Mills, which emphasized the need for unanimous decisions, could easily have lead the jury to believe that unanimity was required to find the existence of a mitigating circumstance. Such is not the case here.
In the instant case, the trial judge, in addition to the general mitigation instruction provided above, also instructed the jury as to the list of mitigating circumstances found in La.C.Cr.P. art. 905.5. In addressing a similar argument and instruction in State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116 (unpub'd appdx), we found that "[a] fair reading of the instructions does not suggest a requirement of unanimity in consideration of a mitigating factor." Likewise, we find that the instructions at issue in this case do not suggest to the jury a need to unanimously find the existence of a mitigating factor, especially when one considers the following instruction:
Each of you must decide the case for yourself, but only after discussion and impartial consideration of the case with your fellow jurors.
You are not advocates for one side or the other. Do not hesitate to re-examine your own views and to change your opinion if you are convinced you are wrong, but do not surrender your honest belief as to the weight and effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a penalty.
This assignment of error thus lacks merit.

Burdens of proof
Defendant next contends that a burden of proof must be established for mitigating factors, and that the jury should have been instructed as to such a burden. We have rejected this claim before, and we reject it again in this case. See State v. Jones, 474 So.2d 919, 932 (La.1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986) ("The capital sentencing procedure does not establish any presumption or burdens of proof with respect to mitigating circumstances.").
This assignment of error thus lacks merit as to the burden of proof with respect to mitigating circumstances.

Instruction on defendant's failure to testify
Finally, defendant contends the trial court erred by failing to instruct the jury during the penalty phase that no negative inferences could be drawn from defendant's failure to testify, and he cites People v. Ramirez, 98 Ill.2d 439, 75 Ill. Dec. 241, 457 N.E.2d 31 (1993) for this proposition. Ramirez, however, is inapposite, as the trial judge in that case refused to give a requested instruction. In the *194 instant case, no such instruction was requested. Moreover, such an instruction was given prior to jury deliberations in the guilt phase. Further, the trial judge instructed the jurors prior to penalty phase deliberations that they could consider any evidence presented during the guilt phase. Accordingly, it is reasonable to infer that the jurors applied this instruction to the penalty phase as well as the guilt phase. See State v. Langley, 95-1489 (La.4/14/98), 711 So.2d 651 ("At the end of the guilt phase, the judge had charged that the defendant was not required to testify and that no presumption nor inference of any kind could be drawn from the fact that the defendant did not testify. During the penalty phase the judge instructed the jurors that they could `consider the evidence adduced at the guilt-determination trial.' Under the circumstances, it is reasonable to conclude that the jurors applied the instruction from the guilt phase when the defendant did not testify.").
This assignment of error thus lacks merit as to the instruction on defendant's failure to testify.

MISCELLANEOUS ERRORS

Sequestration/ defendant's assignment of error number 8
In this assignment of error, defendant contends that one juror was not instructed when the others were, as she was "missing from the group." He further asserts that the reasons for her absence were unclear, and she "never was instructed the way [the other jurors] were."
Under La.C.Cr.P. art. 791(B), "in capital cases, after each juror is sworn, he shall be sequestered, unless the state and the defense have jointly moved that the juror not be sequestered." In the instant case, the record reflects that the state and defense jointly moved that the jurors not be sequestered until the start of trial. Thus, there was no violation of sequestration, as the incident complained of in this assignment of error occurred before the start of trial, when the jurors were not yet sequestered. Further, the record reflects that the juror whom defendant complains was absent from the instructions and swearing in had been sworn in and instructed before the other eleven jurors. Finally, defendant does not allege, nor can we ascertain from the record, how this incident prejudiced him.
This assignment of error thus lacks merit.

Incomplete record/ defendant's assignment of error number 16

Guilt verdict
Defendant contends the trial record does not reflect the jury's verdict in the guilt phase. This assertion is blatantly incorrect. The record for the beginning of the penalty phase clearly reads:[19]
Ladies and gentlemen, now that you have reached a verdict on the guilt of the defendant in this matter ...
The record also contains the jury's verdict sheet:
We, the jury find the accused, Todd K. Wessinger, guilty of first degree murder.
The trial court minutes, which are contained in the record, also reflect the verdict:
At 5:30 p.m., the jury returned. The accused was present in court with counsel, and counsel for the State also being present. The jury was returned to the courtroom, the polling thereof being waived by counsel for all parties. The jury, through its foreperson, returned the following verdict: "Mary Daniel-Foreperson, June 24, 1997, Guilty of First Degree MurderTwo Counts." At this time, the Court ordered the minute clerk to poll the jury. The clerk polled the jury by asking each member *195 thereof the following question: "(Name of juror), is that your verdict to Count One and Court [sic] Two?" All twelve jurors answered in the affirmative as to each count.
Finally, the record has been supplemented and now contains the transcript of the reading of the verdict and the polling of the jury.
This assignment of error clearly lacks merit as to the verdict in the guilt phase of trial.

Motion for new trial
Defendant next contends that the transcript does not reveal that a motion for a new trial was filed in this case, and this is "inconceivable." He further contends that the failure of trial counsel to file such a motion is reversible error. Defendant does not, however, allege any bases for a new trial. At any rate, this assertion is best classed as a claim of ineffective assistance of counsel.
Ineffective assistance of counsel claims are customarily addressed in postconviction proceedings, not on direct appeal. State v. Brumfield, 96-2667 (La.10/20/98), 737 So.2d 660; State v. Hart, 96-0697 (La.3/7/97), 691 So.2d 651. However, in those rare circumstances where the evidence needed to decide the issue may be found in the record, we have addressed the claim on direct appeal. State v. Cousan, 94-2503 (La.11/25/96), 684 So.2d 382. This evidence is not present in this record. This assignment of error is thus relegated to post-conviction proceedings.

Cumulative error/ defendant's assignment of error number 17
In this assignment of error, defendant contends the aggregate effect of the many errors in this case, including those both assigned by him and any we may unearth in the an independent review of the record, mandate that he receive a new trial or sentencing hearing.
We have carefully analyzed each of defendant's assignments of error. Further, we have conducted an independent review of the record. Neither any of defendant's assigned errors, nor anything else in the record, merits reversal of his case. Indeed, most of his assignments of error are completely lacking in merit, and scant those few that are colorable merely constitute harmless error. We simply do not believe that "the cumulative effect of assignments of error lacking in merit warrants reversal of a conviction or sentence." State v. Strickland, 94-0025 (La.11/1/96), 683 So.2d 218.
This assignment of error thus lacks merit.

Inappropriateness of death penalty/ defendant's assignment of error number 18
In this assignment of error, defendant contends that the death penalty is inappropriate in this case. This contention is addressed by our Capital Sentence Review.

SENTENCE REVIEW
Under La.C.Cr.P. art. 905.9 and La. S.Ct.R. 28, this Court reviews every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, we consider whether the jury imposed the sentence under the influence of passion, prejudice, or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender. In the instant case, the trial court has submitted a Uniform Capital Sentence Report ("UCSR"), and the Department of Public Safety and Corrections ("DOC") has submitted a Capital Sentence Investigation ("CSI"). In addition, the State and defendant both filed objections to the UCSR. The State also filed a Sentence Review Memorandum.
*196 The UCSR and the CSI both indicate that the defendant is an African-American male born on November 28, 1967 to Linda and Horace Wessinger. He is the third of four children. The defendant reported his father died on March 10, 1994. The defendant advised his interviewer from DOC that he grew up in Baton Rouge and completed the 11th grade. He further indicated that while in 12th grade, he was suspended for fighting and attended an alternative school; however, he quit before graduation. He stated that he later received his GED in Dallas, where he moved in 1991 to search for work. Defendant's intelligence level was placed in the medium range (IQ: 70-100). Although defendant has never married, he has five children with four different mothers. These children range in age from 2 to 10 years old.
While living in Dallas, defendant worked at two nursing homes, the Hampton Inn, and Haggar Apparel. He then moved back to Baton Rouge after his father died. After returning to Baton Rouge, he worked at Calendar's Restaurant, the family lawn care service, and the local CocaCola plant, which was his last job prior to his arrest for the instant offense.
Defendant's criminal history includes a 1990 arrest for attempted manslaughter, which was expunged, and charges for simple battery, which were no billed. In 1995, defendant pled guilty to simple battery and was sentenced to one year unsupervised probation. While living in Dallas he pled guilty to carrying a prohibited weapon and was sentenced to pay a fine of $717, as well as 12 months probation.

Passion, Prejudice, and other Arbitrary Factors
The record does not provide any indicia of passion, prejudice, or arbitrariness. Although the case involved an African-American defendant, two white victims, and an all-white jury, nothing in the record suggests that race was an issue at trial. See State v. Taylor, 93-2201, p. 34-35 (La.2/28/96), 669 So.2d 364, 381 (no passion or racial prejudice resulted from the fact that defendant was 30-year-old black male and jurors were all white and two murder victims were white). Although the defendant contends that jurors were systematically excluded by race, this claim was treated, supra, and found to be without merit. The UCSR also indicates defendant's case received extensive media coverage. However, as discussed above in defendant's change of venue claim, only 5 potential jurors out of 64 were excused due to exposure to pre-trial publicity. Moreover, defendant's trial took place one and one-half years after the crime occurred.

Aggravating Circumstances
At trial, the State argued that three aggravating circumstances existed: (1) that the offender was engaged in the commission of aggravated burglary or armed robbery; (2) that the offender knowingly created a risk of death or great bodily harm to more than one person; and (3) the offense was committed in an especially heinous, atrocious, or cruel manner. La.C.Cr.P. art. 905.4(A)(1), (4), (7). The jury found the existence of all three circumstances.
The record fully supports a finding that the instant murders were committed in the course of an armed robbery or aggravated burglary and that defendant knowingly created a risk of death or great bodily harm to more than one person. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Even accepting defendant's claim, addressed supra, that the evidence failed to support that the murders were "committed in an especially heinous, atrocious, or cruel manner," the inclusion of this aggravating circumstance did not interject an arbitrary factor into the proceedings, as evidence of the manner in which the offense was committed and of the nature of the victims' injuries were all relevant and properly admitted at trial. See State v. Roy, 681 So.2d 1230, 1242 (La.1996).

*197 Proportionality

The federal Constitution does not require a proportionality review. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). However, comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana, State v. Burrell, 561 So.2d 692 (La.1990); State v. Wille, 559 So.2d 1321 (La.1990); State v. Thompson, 516 So.2d 349 (La.1987), though this Court has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, finding in that one case, inter alia, a sufficiently "large number of persuasive mitigating factors." State v. Sonnier, 380 So.2d 1, 9 (La.1979); see also State v. Weiland, 505 So.2d 702, 707 (La.1987) (in case reversed on other grounds, dictum suggesting that death penalty disproportionate).
This Court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises.
Jurors in the Nineteenth Judicial District Court, which comprises East Baton Rouge Parish, have recommended imposition of the death penalty on 16 occasions, including the current case. Several of the salient features of the instant case make it similar enough to other death sentences recommended by juries in the 19th JDC that defendant's sentence is not disproportionate. See, e.g. State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364 (during armed robbery of the Cajun Fried Chicken restaurant where defendant had previously been an employee, he shot and killed one employee and permanently paralyzed another); State v. Williams, 383 So.2d 369 (La.1980) (defendant shot and killed the victim during an armed robbery of an A & P Grocery Store); State v. Scales, 93-2003 (La.5/22/95), 655 So.2d 1326 (defendant, while engaged in the armed robbery of a Church's Fried Chicken restaurant, shot and killed one of the employees); State v. Brumfield, 96-2667, (La.10/20/98), 737 So.2d 660 (defendant and co-defendant shot and killed police officer escorting grocery store manager who was making a night deposit); State v. Broadway, Docket No. 2-94-1720 (appeal pending) (defendant and co-defendant shot and killed police officer escorting grocery store manager who was making a night deposit); State v. Williams, 96-1023 (La.1/28/98), 708 So.2d 703 (defendant murdered victim while attempting to rob him in his truck; earlier that day, defendant had shot and wounded another victim during the attempted perpetration of an armed robbery); State v. Craig, 95-2499 (La.5/20/97), 695 So.2d 865 (defendant kidnaped the victim while stealing his truck and ultimately drove him to a secluded area and shot him three times in the head).

Decree
For the reasons assigned, defendant's conviction and sentence are affirmed for all purposes, except that this judgment shall not serve as a condition precedent to execution, as provided by La.R.S. 15:567, until either: (1) defendant fails to petition the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari and either (a) defendant, having filed for and been denied certiorari fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari, or (b) that Court denies his petition for rehearing.
LEMMON, J., concurs and assigns reasons.
LEMMON, J., Concurring.
I disagree with the majority that the prosecutor's questioning of the defense expert in executive clemency and correction about the number of times a victim's family will have to attend hearings before the *198 Pardon Board was properly within the scope of cross-examination.
If the prosecutor simply wanted to elicit proof of the statistical probability of commutation, a simple question about the availability of successive applications for commutation would have provided that arguably relevant evidence. However, the content of the questions actually used by the prosecutor was an obvious attempt to get before the jury indirectly the victim impact evidence (the impact on the family of a series of commutation applications) that would not have been admissible if the questions had been asked directly. The questions appear to be framed in terms of the victim's family's suffering in order to encourage the jury to recommend the death penalty for reasons unrelated to the circumstances of the murder and the character and propensities of the murderer.
The admissibility of victim impact evidence is very limited, such as evidence to show that the victim was a unique person and had survivors. The fact that the murderer should have known this information bears on the murderer's character traits and moral culpability. State v. Bernard, 608 So.2d 966, 972 (La.1992).
Here, the prosecutor in his case-in-chief in the penalty phase had already gone at least to the limits of permissible victim impact evidence. This additional victim impact reference, made indirectly in the context of a frequency-of-commutation inquiry, exceeds the limits, in my view. Nevertheless, I am inclined to the view that these questions, even on top of the other victim impact evidence, were harmless beyond a reasonable doubt, particularly in view of the premeditated nature of these horrible crimes for monetary gain and of the 911 telephone call recording, heard by the jury, in which the female victim begged unsuccessfully for her life.
NOTES
[*] Knoll, J. not on panel. Rule IV, Part 2, § 3.
[1] Armentor later identified defendant in a photo lineup, and he testified at trial.
[2] Ricks, who testified at trial, picked defendant out of a photo lineup a couple of hours after the crime.
[3] Bates did not attempt to obtain a lawyer for defendant immediately because the time was 3:30 a.m.
[4] There were also hearings on April 2, 1996 and March 26, 1997. The trial judge deferred his ruling until after the jury was selected.
[5] See, e.g. State v. Wilson, 467 So.2d 503 (La.1985) (4 of 39 potential jurors struck for cause, although 24 of 39 had heard of crime); State v. Connolly, 96-1680 (La.7/1/97), 700 So.2d 810 (although approximately 86% of potential jurors had heard of case, most had only a vague recollection of facts and could not remember specific details of the crime); State v. Rodrigue, 409 So.2d 556 (La.1982) (court found change of venue unnecessary where, in mock voir dire, 26 of 30 prospective jurors had heard of case, but only 9 had a set opinion about the case).
[6] The prosecutor argued to strike Cuadra on the basis that "Mr. Cuadra is sitting there and knows this evidence front to back says he's glad the defendant was taken off the streets and knows my case, so the state moves to exclude him so that I don't have a legal defect in a conviction, so if I get one, which would prejudice the State."
[7] Specifically, defense counsel said:

And one thing. I had not gone into prison life. We will let Mr. Sinquefield go to that. We didn't bring that up on direct. Let the jury hear that. We are not trying to hide anything. (Emph.added.)
[8] Indeed, we note that defendant in the instant case enjoyed the assistance of extremely able counsel at both the trial and appellate levels.
[9] See Webster's New Collegiate Dictionary 414 (G. & C. Merriam Co.1977) (a group of persons of common ancestry); Black's Law Dictionary 728 (West 1968) ("In most common usage, the word implies father, mother, and children, immediate blood relatives.") (citation omitted).
[10] Defendant's evidence at this phase of trial comprises 115 pages.
[11] The testimony of these witnesses makes up 9 of the 16 pages of the State's victim impact evidence.
[12] This instruction was:

[Y]ou heard testimony in this case from the survivors of the victims. These people are called as victim impact witnesses. Evidence adduced from a victim impact witness is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question. The witness, however, is not called into court for [the] purpose of deciding the penalty in the case. You, the jurors, are the ones who must bear the responsibility of deciding the penalty to be received by the defendant.
[13] We have previously assumed without deciding that "lack of sympathy" statements were erroneous in State v. Frost, 97-1771(La.12/1/98), 727 So.2d 417, 432.
[14] Upon hearing the tape of his daughter's last moments, Mr. Guzzardo shouted out "son of a bitch."
[15] The statute provides:

Notwithstanding any provision to the contrary, the court shall instruct the jury that under the provisions of the state constitution, the governor is empowered to grant a reprieve, pardon, or commutation of a sentence following conviction of a crime, and the governor may, in exercising such authority, commute or modify a sentence of life imprisonment without benefit of parole to a lesser sentence including the possibility of parole, and may commute a sentence of death to a lesser sentence of life imprisonment without benefit of parole. The court shall also instruct the jury that under this authority the governor may allow the release of an offender either by reducing a life imprisonment or death sentence to the time already served by the offender or by granting the offender a pardon. The defense may argue or present evidence to the jury on the frequency and extent of use by the governor of his authority. (Emph.added.)
[16] We note that this prosecutor has previously come perilously close to committing reversible error, and we caution him to tread carefully in the future.
[17] This statute provides:

Notwithstanding any provision to the contrary, the court shall instruct the jury that under the provisions of the state constitution, the governor is empowered to grant a reprieve, pardon, or commutation of sentence following conviction of a crime, and the governor may, in exercising such authority, commute or modify a sentence of life imprisonment without benefit of parole to a lesser sentence including the possibility of parole, and may commute a sentence of death to a lesser sentence of life imprisonment without benefit of parole.
[18] This mistrial was the subject of defendant's assignment of error number 1.
[19] Indeed, there would not have been a penalty phase at all had defendant not been found guilty of first degree murder.