781 So.2d 73 (2001)
STATE of Louisiana
v.
Gill HARRIS.
No. 99-KA-2845.
Court of Appeal of Louisiana, Fourth Circuit.
January 24, 2001.
Rehearing Denied March 30, 2001.
*76 Harry F. Connick, District Attorney, Juliet Clark, Assistant District Attorney, New Orleans, LA, Counsel for State of Louisiana.
Yvonne Chalker, Louisiana Appellate Project, New Orleans, LA, Counsel for Gill Harris.
Court composed of ARMSTRONG, JONES and LOVE, Judges.
JONES, Judge.
Defendant/appellant, Gill Harris, appeals his conviction and sentence for the rape of a seven-year old child. Following a review of the record, we hereby affirm the defendant's conviction and sentence.

FACTS
Imelda Wylie testified at trial that the victim, K.C., her niece, and K.C.'s mother V.C.[1], were residing with Harris at the time K.C. informed her of the rape. Ms. Wylie was initially given custody of the K.C. from age three to four years old because V.C.'s husband, not the defendant, had purportedly molested the child. When K.C. was returned to V.C., V.C. had begun taking Phenobarbital and Tegratol, which was prescribed to her to control her epileptic seizures; however, as a side effect, V.C. became sluggish and not as attentive to her surroundings. In fact, Ms. Wylie testified that some or all of V.C.'s children, including K.C., had lived with her at one time or another.
*77 In 1996, K.C. was living with Ms. Wylie while V.C. resided with Harris. V.C. later took K.C. back at the beginning of the school year. Later that year, K.C. stayed with Ms. Wylie during either the Thanksgiving or on Christmas holidays. Ms. Wylie described K.C.'s behavior as withdrawn stubborn, and disobedient. She even lost a great deal of weight during the time she lived with V.C. and Harris. However, prior to living with V.C. and Harris, K.C. was an energetic and outgoing child. Because of the major change in her behavior, Ms. Wylie believed that K.C. was sick.
A couple of weeks later, K.C.'s normal personality returned to what it had been before she went to live with her mother and Harris. K.C. later disclosed to Ms. Wylie that Harris had done some bad things to her such as: tried to penetrate her vagina with his finger, asked her to put her mouth on his penis, and rubbed his penis across her face and lips. K.C. informed her that Harris put Vaseline on his penis and attempted to penetrate her. She also said that Harris told her not to scream because "it" would not last long. He also told her to not tell anyone what he had done.
K.C. further also told Ms. Wylie that Harris once pulled her underwear down and tried to penetrate her, but that her mother came home-so he hurriedly pulled up her pants, sat down, and told her to keep quiet. K.C. told her that what Harris had done caused her pain. When K.C. told her mother what Harris had done, she had told K.C. not to worry because one day she was going to get mad and notify the police.
Because V.C. prior husband had molested K.C., the State questioned Ms. Wylie to determine whether K.C. could clearly distinguished between the two men. Ms. Wylie answered in the affirmative. On redirect, Ms. Wylie indicated that K.C. began staying with her every weekend after the New Year's Day (1997) holiday.
New Orleans Police Detective Kirk Johnson testified to the procedures child abuse investigators used to determine whether a child can distinguish between the truth and a lie. Det. Johnson testified that on February 5th his office received an anonymous tip that K.C. was being abused. When he and another detective went to K.C.'s home, K.C. was non-responsive to their questions. However, after K.C.'s mother was brought in, she became relaxed started answering their questions. From the answers K.C. gave during questioning, Det. Johnson realized that K.C. could understand the difference between the truth and a lie.
Det. Johnson testified that during questioning, K.C. informed him that on January 18th, V.C. had taken three of her brothers to a football clinic while she and her brother, C.C., stayed home with Harris. Harris then persuaded her to go into one of the bedrooms whereby he pulled down her pants and panties, unzipped his pants, and pulled out his penis. He then sat K.C. on his lap, and rubbed his penis against her for a few minutes. K.C. later mentioned the incident to C.C., who told V.C. on February 3rd.
Detective Johnson testified that because the abuse had occurred in mid-January, the victim simply was examined by an appointment some three to four weeks later. On cross-examination, Detective Johnson testified that out of the one hundred child abuse cases he investigated within one year, 50% of the cases have resulted in arrests while 5% have resulted in convictions. One factor leading to an arrest was a positive medical examination, which indicated sexual abuse. Det. Johnson also testified that K.C.'s demeanor during the investigation suggested that she was not fabricating.
*78 Dr. Anas Khouri, an expert witness in the field of child sexual abuse, examined K.C. on February 21, 1997. She testified that K.C. informed her that Harris told her to "get booty with her brother." K.C. also told her that Harris touched her private area with his hands and his penis, and put his penis inside of her mouth. Dr. Khouri also testified that K.C. told her that Harris' penis did not go inside her, but he did hurt her. Dr. Khouri's conversation with K.C. also revealed that Harris coaxed K.C. to touch his penis by offering her a peppermint candy. Harris also threatened to kill K.C.'s brothers if she ever told anyone what happened.
Dr. Khouri testified that K.C.'s external genitalia looked fine, with no lacerations or redness, and that her hymen was intact. Dr. Khouri explained that her findings were not surprising because in children penetration usually does not pass the hymen-it usually causes the hymen to stretch, but not break. Dr. Khouri testified that children who are sexually abused or abused in any fashion tend to avoid eye contact, exhibit sadness or depression. In this case, Dr. Khouri observed all three signs in K.C.'s behavior during their interview. Dr. Khouri further testified that in her report she labeled K.C.'s physical exam as normal, but that she could not rule out sexual abuse. She also reiterated that in most cases "you don't find anything."
Dr. Khouri also testified that she was unable to conclude with any degree of certainty that K.C. had been abused, and that the child's physical examination was no different than that of a child who had not been sexually abused. Dr. Khouri also testified that K.C. understood her questions about where Harris placed his penis when they were in the bedroom. However, on cross-examination, Dr. Khouri conceded that she could not tell defense counsel that for certain because her interview with K.C. took place over two years ago. When Dr. Khouri inquired as to whether K.C. had been abused in the past, she replied that Harris let her brother "get booty" with her. On redirect examination, Dr. Khouri testified that K.C. told her that Harris abused her "a lot of times".
June Matthews Lombard, who was twenty-five years old at the time of trial, testified that when she was eleven years old, she, her mother, and her sister lived with Harris in the 1980's. While residing with Harris, Ms. Lombard testified that when she was eleven years old, Harris had intercourse with her in the living room of the house on several occasions. She testified that she did not tell anyone for fear that she would be blamed for what happened.
On one occasion, Ms. Lombard testified that she reported Harris to the police, but her complaint was that Harris "had said some inappropriate things to her." According to her testimony, the police were originally called because Ms. Lombard's sister had pulled a knife on their mother because the sister believed that Harris had "done something" to Ms. Lombard. During the interview, Ms. Lombard did not inform the police that Harris had engaged in sexual intercourse with her.
LeLaura Matthews Smith, Ms. Lombard's sister, testified that Harris began abusing her when she was approximately six or seven years old. She testified that Harris would feel on her vagina and have her to touch his penis. She also testified that Harris had intercourse with her in the living room as well. Although she did not recall how many times Harris had sex with her, Ms. Smith testified that it "seemed to happen all of the time." Ms. Smith further testified that the abuse lasted for over three years. Ms. Smith's relationship with *79 her mother became very hostile when Harris turned her mother against her.
On one occasion, Ms. Smith testified that Harris forced her mother to leave home. When Ms. Smith tried to come back home, Harris scolded her until she pulled a knife on him, which she kept for protection. Her mother and Harris then telephoned the police, and when the police arrived Ms. Smith told them that Harris had been abusing "us." She then testified that she knew Harris had been abusing her younger sister by the way he interacted with her.
On cross-examination, Ms. Smith testified that she did tell her aunt that Harris and a previous stepfather had abused her when she was younger. However, the intercourse she had with Harris did not make full penetration. On re-direct, Ms. Smith testified that Harris would always put a condom on when he had sexual relations with her.
K.C., who was nine years old at the time of trial, testified that she did not like Mr. Gill, the name she used to identify Harris, because he was "mean." She testified that Harris had done mean things to her in the living room. Shortly thereafter, the State requested a recess. During the twentyminute recess, K.C. was brought into the judge's chambers along with the prosecutor and some of K.C.'s family members.
Following the recess, defense counsel moved for a mistrial, which motion was denied. When K.C. returned to the witness stand, the State continued questioning her regarding the incident that occurred in the living room. K.C. testified that "almost every night" Harris tried to put his penis in her vagina. When she was asked whether his penis went into her vagina, K.C. responded "No." When asked if he ever put anything on his penis to help it go in, she answered "Vaseline." However, she testified that Harris was not able to go inside of her. K.C. also testified that Harris made her touch his penis in other rooms of the house, including the kitchen and his bedroom. Both incidents took place while her mother was not home.
On cross-examination, K.C. testified that the first person she told about these things was her mother. Although she did not remember when she told her mother, she acknowledged that it was before the police arrested Harris. She also admitted that she told the police everything that happened, but not her mother. K.C. testified Harris did not take all of his or her clothes off when they had sex; however, he did undress her to her panties and pulled his clothes down to his knees.
V.C. testified that she and Harris were never married, but that they did live together. Later, she moved her four sons and K.C. into their house. V.C. recalled K.C. telling her about being abused by Harris, but only after police came to investigate in February 1997 and later arrested Harris. However, she denied ever seeing anything inappropriate between K.C. and Harris. V.C. testified that it was possible that K.C. told her about the incident on a previous occasion, but because of the medication she was taking, Phenobarbitol, made her sleepy, she was not certain.

ERRORS PATENT
A review of the record reveals no errors patent.

OTHER CRIMES EVIDENCE
In this assignment of error, Harris claims that the trial court erred in permitting the State to introduce evidence of other crimes allegedly committed by him. More specifically, Harris alleged abuse of LeLaura Smith and June Lombard, his one-time stepdaughters.
La. C.E. art. 404(B)(1) provides:

*80 Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. (Emphasis added).
The general rule of La. C.E. art. 404(B)(1) prohibits the admission of other crimes evidence at trial because of the danger that the trier of fact will convict the defendant of the immediate charge based on his prior criminal acts. State v. Jones, 99-0861, p. 17 (La.App. 4 Cir. 6/21/00), 769 So.2d 28, 40. To admit "other crimes" evidence pursuant to one of the exceptions provided by La. C.E. art. 404(B)(1), such evidence must tend to prove a material fact genuinely at issue, and the probative value of the extraneous crimes evidence must outweigh its prejudicial effect. State v. Tilley, 99-0569 (La.7/6/00), 767 So.2d 6. There must be clear and convincing evidence of the commission of the other crimes and the defendant's connection therewith. State v. Hills, 99-1750 (La.5/16/00), 761 So.2d 516. Finally, the defendant must be given notice and afforded a hearing at which time the State must show that the evidence is admissible. State v. Prieur, 277 So.2d 126 (La.1973).
"Louisiana has followed the national trend towards broader admissibility of other crimes evidence in cases involving alleged sexual abuse of minor children." State v. Miller, 98-0301, p. 4 (La.9/9/98), 718 So.2d 960, 963, citing Pugh, Handbook on Louisiana Evidence Law 1996, 284. Particularly, the Miller court noted that it had first recognized the "lustful disposition" exception in State v. Cupit, 189 La. 509, 179 So. 837 (1938), where evidence that the defendant charged with assault with intent to commit rape of his young niece had raped another niece and had been charged with the rape of a third niece was admissible in that the "the prior offenses... clearly tended to show the lustful disposition the defendant bore towards his nieces, and his unnatural desire to have sexual intercourse with them; all of his nieces being children of tender age." Miller, 98-0301 at p. 6, 718 So.2d at 963, citing Cupit, 189 La. at 516, 179 So. at 839.
In State v. Black, 98-0457 (La.App. 4 Cir. 3/22/00), 757 So.2d 887, the defendant was charged with the aggravated rape of a juvenile, and nine counts of molestation of a juvenile. The defendant pleaded guilty to eight of the nine counts of molestation, and was tried on the aggravated rape count. Following a Prieur hearing, the trial court ruled that evidence of prior acts of molestation of the victim's two sisters were admissible. This Court affirmed that ruling, holding that the evidence was admissible to show the defendant's lustful disposition. This Court further found that, even though aggravated rape was a general intent crime, the element of intent was an essential ingredient, and the evidence of similar but disconnected crimes was relevant to show the intent with which the act was committed. Additionally, this Court found that the evidence was admissible to show plan, i.e., that the defendant took advantage of the one-on-one situations where he was left alone with one of the sisters in the trailer.
In the case sub judice, as in Black, the defendant was charged with the aggravated *81 rape of a juvenile-a person under the age of twelve. As in Black, the testimony of defendant's former stepdaughters was admissible because it established that the defendant Harris had intercourse with them when they were juveniles. The defendant's lustful disposition for female juvenile children is evidence considering that the actions were not the first incident where he sexual abused children of his legal or common-law wives, who were living in the household with their mother and defendant at the time of the abuse. Defendant makes no argument as to the inadmissibility of such evidence to show lustful disposition. In addition, as in Black, the evidence was admissible to show intent, even though only general intent is necessary to prove the offense of aggravated rape. It is not necessary, however, to consider whether evidence of such acts was admissible to show plan.
The State gave timely notice to defendant of its intent to present this evidence, and a hearing was held on September 4, 1998. At the hearing, New Orleans Police Detective Joseph Hebert testified that he investigated complaints of child sexual abuse lodged against the defendant in April 1987. LaLaura Matthews related that she had sexual intercourse with defendant over a period of time when he was a member of her household, beginning when she was approximately ten years old. June Matthews informed him that Harris requested that she have sexual intercourse with him, but she refused. Det. Hebert testified that Ms. Matthews was ten years old when he interviewed her, but she could not recall how old she was when the incidents allegedly occurred.
A third sister, Karissa Matthews, informed Det. Hebert that Harris had a habit of reaching underneath her clothes and touching her breasts and vagina with digital penetration. Det. Hebert testified that in connection with these incidents, Harris was charged with aggravated rape, attempted indecent behavior with a juvenile and indecent behavior with a juvenile, respectively. Following the hearing, the trial court ruled that the testimonies of the defendant former stepdaughters were admissible.
We cannot say that the trial court erred in accepting Det. Hebert's testimony as accurate. The testimony of LaLaura Smith and June Lombard confirms that Det. Hebert accurately testified at the Prieur hearing as to the particular acts of molestation. LaLaura Matthews Smith testified that defendant began molesting her when she was six or seven and then began having intercourse with her in the living room. June Matthews Lombard testified that defendant had intercourse with her several times, beginning when she was eleven years old, and that the encounters occurred in the living room. She testified that she never told anyone because she was afraid she would be blamed. Therefore, she did not tell anyone of the incident between Harris and herself when she was interview in 1987.
Because of this discrepancy between Det. Hebert's testimony at the Prieur hearing and June Lombard's testimony at trial, defendant argues that he did not receive proper Prieur notice. It is clear that such evidence regarding Ms. Lombard would have been admissible pursuant to LSA-C.E. art. 404(B)(1). Nevertheless, the question before this Court is whether Harris was prejudiced from not having pretrial notice that the incidents occurring before the one in question would be presented at trial.
The evidence defendant presented to rebut the allegations of LeLaura Matthews Smith and June Matthews Lombard was simply testimony by his daughter that she did not recall anything happening when *82 she and the Matthews sisters lived with defendant. However, the defendant does not offer any indication of what evidence he would have presented to refute their testimony. Defendant fails to make a showing that he was prejudiced by not receiving specific notice that June Lombard would testify to intercourse, and he is not entitled to a reversal of his conviction on this issue. See La.C.Cr.P. art. 921.
Defendant does not argue that the ten-year span between the prior crimes and the ones at issue in the instant case prejudiced him. Further, he does not make any argument concerning the difference between the ages of June and LaLaura at the time they were molested, versus K.C.'s age at the time she was molested.
Moreover, implicit in the trial court's ruling is a finding that the probative value of the evidence was not substantially outweighed by its prejudicial effect. The potential prejudicial effect is that the jury would convict defendant because it would believe that since he committed the earlier crimes he must have committed the instant crime. However, the evidence is highly probative to show defendant's lustful disposition toward the juvenile female children of his legal/common law wives while living with them. Thus, we find no error by the trial court in ruling that the probative value of the evidence was not substantially outweighed by any unwanted prejudicial effect. Accordingly, there is no merit to this assignment of error.

HEARSAY TESTIMONY
In this assignment of error, defendant claims the trial court erred in allowing Ms. Wylie's hearsay testimony to be admitted regarding the substance of the statements made to her by the victim, K.C.
Imelda Wylie, the victim's aunt, testified over the objection of defense counsel as to statements made to her by the victim detailing her sexual abuse by defendant. Her testimony was offered as proof of the truth of the matter asserted and, absent an exception, it ordinarily would constitute inadmissible hearsay. See La. C.E. arts. 801(C), 802. However, the State filed a notice of intent to introduce hearsay statements made to Ms. Wylie by K.C. when K.C. initially complained of Harris inappropriate sexual behavior towards her.
LSA-C.E. art. 804(B)(5), provides for the admissibility of an initial or otherwise trustworthy complaint made by a person under the age of twelve years, if the declarant is unavailable as a witness. In the instant case, the victim was available as a witness, and testified at trial. Therefore, LSA-C.E. art. 804(B)(5) is not applicable. State v. Johnson, 97-1519, p. 9 (La.App. 4 Cir. 1/27/99), 726 So.2d 1126, 1131, writ denied, 99-0646 (La.8/25/99), 747 So.2d 56.
However, La. C.E. art. 801(D)(1)(d) provides that a statement is not hearsay if the declarant testifies at trial, is subject to cross examination concerning the statement, and the statement is "[c]onsistent with the declarant's testimony and is one of initial complaint of sexually assaultive behavior." Id. This Court has strictly limited the term "initial complaint" to its narrow literal meaning the "first" or "original" complaint. State v. Atkins, 97-1278, p. 16 (La.App. 4 Cir. 5/27/98), 713 So.2d 1168, 1177.
Ms. Wylie testified that when K.C. told her about the sexual abuse, K.C. had already told her mother and brothers. Ms. Wylie also testified that K.C. first told her of the abuse after defendant had been arrested, "around the first time they were going (sic) for a hearing to court." Although Harris was not indicted until April 17, 1997, and arraigned until April 22, *83 1997, Det. Johnson testified that Harris was placed under arrest on February 5, 1997 for the rape of K.C., which was the same date Det. Johnson had interviewed the victim. Though K.C. testified that she did not recall when she told her mother of the abuse, she did confirm that it was before Harris was arrested.
V.C. testified that K.C. only told her of the abuse after Harris was arrested. Det. Johnson testified that it appeared that K.C.'s mother was hearing of the abuse for the first time when he was interviewing the child at home on the day of Harris' arrest.
Even if the victim's mother did hear of the victim's abuse for the first time during the interview, the evidence clearly establishes that the victim's statements to Ms. Wylie were made after the police interview, and thus did not constitute her initial complaint. Accordingly, Ms. Wylie's testimony was inadmissible hearsay, and the trial court erred in admitting that evidence over the objection of defense counsel. It remains to be decided whether that error was harmless. The proper inquiry when assessing whether an error was harmless is whether the guilty verdict actually rendered in this trial was surely unattributable to the error. State v. Snyder, 98-1078, p. 15 (La.4/14/99), 750 So.2d 832, 845.
Ms. Wylie was the first witness presented in the State's case in chief, and the first to testify as to the facts of the abuse. Her testimony also buttressed the victim's credibility. Moreover, K.C.'s testimony and Ms. Wylie's testimony corroborated each other concerning the issue of penetration. Though the K.C. was hesitant to testify about the abuse, until a brief recess with the judge in chambers, her testimony after returning to the witness stand apparently was credible to the jury.
We also find that Dr. Khouri's testimony that the victim told him that defendant penetrated her was also inadmissible hearsay. No one else testified that Harris actually penetrated the victim's hymen. However, the testimony of the Matthews sisters established that defendant had a "lustful disposition" for the juvenile daughters of his legal or common-law wives. The victim's brother testified that Harris and K.C. had been alone together in Harris' bedroom on prior occasions. He also testified that on one occasion he saw both of them in the livingroom fully undressed with the lights off, and K.C. was sitting on defendant's lap.
"If credible, the testimony of a single witness may establish the elements of a crime beyond a reasonable doubt." State v. Womack-Grey, 99-0416, p. 17 (La. App. 4 Cir. 5/17/00), 764 So.2d 108. Although the nine-year old victim froze up when the prosecutor first asked her about the details of the abuse, she did confirm-before meeting with the judge in chambers-that Harris did something "mean" to her in the living room. Considering the extremely embarrassing nature of the offense, her reluctance to testify did not undermine her credibility. The jury was fully aware of her hesitancy to detail the abuse in a crowded courtroom. Thus, the jury determined that her shyness was not due to the fact that the victim had forgotten her "story," or that she had to be coached to testify to something that was not truthful. Accordingly, the testimony of the victim, her brother and the Matthews sisters, the jury's verdict was not attributable to the trial court's error of allowing Ms. Wylie to give hearsay testimony. Hence, there is no merit to this assignment of error.

INEFFECTIVE ASSISTANCE OF COUNSEL
In this assignment of error, defendant claims that trial counsel was ineffective in *84 failing to object to hearsay testimony offered by Dr. Khouri regarding the statements made to her by the victim when she was taking K.C.'s history.
"As a general rule, claims of ineffective assistance of counsel are more properly raised by application for post conviction relief in the trial court where a full evidentiary hearing may be conducted if warranted." State v. Howard, 98-0064, p. 15 (La.4/23/99), 751 So.2d 783, 802, cert. denied, Howard v. Louisiana, 528 U.S. 974, 120 S.Ct. 420, 145 L.Ed.2d 328 (1999). However, where the record is sufficient, the claims may be addressed on appeal. State v. Wessinger, 98-1234, p. 43 (La.5/28/99), 736 So.2d 162, 195, cert. denied, Wessinger v. Louisiana, 528 U.S. 1050, 120 S.Ct. 589, 145 L.Ed.2d 489 (1999); State v. Bordes, 98-0086, p. 7 (La. App. 4 Cir. 6/16/99), 738 So.2d 143, 147. Ineffective assistance of counsel claims are reviewed under the two-part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). State v. Brooks, 94-2438, p. 6 (La.10/16/95), 661 So.2d 1333, 1337 (on rehearing); State v. Robinson, 98-1606, p. 10 (La.App. 4 Cir. 8/11/99), 744 So.2d 119, 126. In order to prevail, the defendant must show both that: (1) counsel's performance was deficient; and (2) he was prejudiced by the deficiency. Brooks, supra; State v. Jackson, 97-2220, p. 8 (La.App. 4 Cir. 5/12/99), 733 So.2d 736, 741. Counsel's performance is ineffective when it is shown that he made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland at 686, 104 S.Ct. at 2064; State v. Ash, p. 9, 97-2061 (La.App. 4 Cir. 2/10/99), 729 So.2d 664, 669, writ denied, 99-0721 (La.7/2/99), 747 So.2d 15.
Counsel's deficient performance will have prejudiced the defendant if he shows that the errors were so serious as to deprive him of a fair trial. To carry his burden, the defendant must show that there is a reasonable probability that, but for counsel's deficient performance the result of the proceeding would have been different; "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, at 693, 104 S.Ct. at 2068; State v. Guy, 97-1387, p. 7 (La.App. 4 Cir. 5/19/99), 737 So.2d 231, 236, writ denied, 99-1982 (La.1/7/00), 752 So.2d 175.
The record is sufficient to resolve this issue. Dr. Khouri's testimony as to statements by the victim was hearsay. However, LSA C .E. art. 803(4) provides that the following is not excluded by the hearsay rule, even though the declarant is available as a witness:
(4) Statements for purposes of medical treatment and medical diagnosis in connection with treatment. Statements made for purposes of medical treatment and medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to treatment or diagnosis in connection with treatment.
Defendant argues that the victim's examination by Dr. Khouri was neither for purposes of medical treatment, nor for medical diagnosis in connection with treatment and, therefore, defense counsel should have objected to the hearsay. Dr. Khouri examined the victim on February 21, 1997-at least one a full month after the last known act of alleged sexual abuse which occurred January 18, 1997. Det. Johnson testified that, because the alleged rape had occurred more than twenty-four hours before police learned of it, the hospital would not examine the victim "right away," and "they," presumably meaning *85 the police, had to schedule an appointment for the victim some three to four weeks after defendant's arrest.
In State v. Coleman, 95-1890 (La.App. 4 Cir 5/1/96), 673 So.2d 1283, unit denied, 97-0042 (La.10/31/97), 703 So.2d 11, the victim was referred to a physician by the district attorney's office some eighteen months after the alleged sexual abuse occurred. The victim received no treatment as a result of the evaluation. This Court recognized that, although a subsidiary purpose of the examination was the identification and treatment of any sexually transmitted diseases or other physical harm that may have resulted from the rape, the "principal reason for the examination was forensic." 95-1890 at p. 5, 673 So.2d at 1287. Accordingly, this Court found that the history given to the examining physician by the victim was not admissible under La. C.E. art. 803(4). This Court also found that the error was harmless considering that the twelve-year old victim's testimony about the incident was very detailed and the physician's report was relatively general. In addition, the victim's mother in Coleman testified to finding the defendant in an aroused state after the victim came running into her room following one attempted rape. The defendant also made several inculpatory statements. Therefore, this Court found beyond a reasonable doubt that the improperly admitted testimony by the physician did not contribute to the verdict "in an otherwise strong case for the State." 95-1890 at p. 6, 673 So.2d at 1287.
In the instant case, the police arranged for the victim's medical examination some four weeks after the last incident of abuse, unlike Coleman, where the examination was eighteen months after the alleged assault. Dr. Khouri testified that as part of the examination a culture was taken from the victim, and blood tests were performed to determine whether she had been infected with any sexually transmitted diseases. However, this was also a recognized subsidiary purpose of the examination in Coleman. Similarly, the victim in the instant case did not receive any medical treatment as a result of her evaluation by Dr. Khouri. It appears beyond question that, as in Coleman, the "principal purpose" of the examination in the instant case was forensic. Accordingly, the history given by the victim to Dr. Khouri was not admissible under La. C.E. art. 803(4).
Although defense counsel elicited some evidence from Dr. Khouri that was favorable to defendant, that evidence concerned the normal findings upon the physical examination, which would have been admissible as objective physical findings. Nevertheless, defense counsel should have objected to the damaging hearsay evidence.
Dr. Khouri's hearsay testimony detailing the statements made by the victim, particularly that defendant went "inside" of her, and it "hurt," clearly prejudiced defendant. Other than the hearsay statements by Ms. Wylie, which were inadmissible, Dr. Khouri's testimony was the only evidence of penetration besides the testimony of the victim. Dr. Khouri's testimony also reflects that the victim reported having a number of similar incidents with the defendant prior to the one in question. Considering this evidence, it cannot be said that there is a "reasonable probability" that had the jury not heard Dr. Khouri's hearsay testimony, the result of the trial proceeding would have been different.
In reaching the decision as to the effect of the two errors regarding the admission of hearsay testimony by Ms. Wylie and Dr. Khouri, we note that the Louisiana Supreme Court has been "unwilling to say that the cumulative effect of *86 assignments of error lacking in merit warrants reversal of conviction or sentence." State v. Strickland, 94-0025, pp. 51-52 (La.11/1/96), 683 So.2d 218, 239; State v. Tart, 93-0772, p. 55 (La.2/9/96), 672 So.2d 116, 154, cert. denied, Tart v. Louisiana, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996). The combined effect of incidences of error, none of which alone amounts to reversible error, does not deprive the defendant of his right to a fair trial. State v. Copeland, 530 So.2d 526, 544-45 (La.1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989), citing State v. Graham, 422 So.2d 123, 137 (La.1982). Therefore, while one might be tempted to find that the cumulative effect of the two errors in this case fairly warrants reversal, the jurisprudence does not permit such a result. Hence, this assignment of error is without merit.

MISTRIAL
In her last assignment of error, defendant claims the trial court erred in failing to grant a mistrial after the trial court recessed the trial for twenty minutes during the victim's testimony.
Pursuant to LSA-C.Cr.P. art. 775, upon motion by a defendant, "a mistrial shall be ordered" when prejudicial conduct in or outside of the courtroom makes it impossible for the defendant to obtain a fair trial. "Mistrial is a drastic remedy, and is warranted only when the defendant has suffered substantial prejudice such that he cannot receive a fair trial." State v. Wessinger, 98-1234, p. 24 (La.5/28/99), 736 So.2d 162, 183, cert, denied, Wessinger v. Louisiana, 528 U.S. 1050, 120 S.Ct. 589, 145 L.Ed.2d 489 (1999). "The determination of whether actual prejudice has occurred, and thus whether a mistrial is warranted, lies within the sound discretion of the trial judge, and this decision will not be overturned on appeal absent an abuse of that discretion." Id.
Having determined that the victim's hesitance during questioning was reasonable in the light her age and the nature of her testimony, we cannot say that the trial court abused its discretion in finding that there had been no prejudicial conduct sufficient to justify the drastic remedy of declaring a mistrial.

SUPPLEMENTAL PRO SE ASSIGNMENT OF ERROR NO. 1
Harris first claims that the trial court erred in failing to maintain a complete record of the proceedings.
La. Const. Art. I, § 19 provides that "[n]o person shall be subjected to imprisonment ... without the right of judicial review based upon a complete record of all evidence upon which the judgment is based." La.C.Cr.P. art. 843 requires, in all felony cases, the recording of "all the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements and arguments of counsel." As a corollary, La. R.S. 13:961(C) provides that, in criminal cases tried in the district courts, the court reporter shall record all portions of the proceedings required by law and shall transcribe those portions of the proceedings required. A criminal defendant has a right to a complete transcript of his trial proceedings, particularly where appellate counsel on appeal was not also trial counsel. State v. Landry, 97-0499, p. 3 (La.6/29/99), 751 So.2d 214, 215. "[W]here a defendant's attorney is unable, through no fault of his own, to review a substantial portion of the trial record for errors so that he may properly perform his duty as appellate counsel, the interests of justice require that a defendant be afforded a new, fully *87 recorded trial." Id. (quoting State v. Ford, 338 So.2d 107, 110 (La.1976)). However, an incomplete record may nonetheless be adequate for appellate review. State v. Hawkins, 96-0766, p. 8 (La.1/14/97), 688 So.2d 473, 480.
However, a slight inaccuracy in a record or an inconsequential omission from it, which is immaterial to a proper determination of the appeal, will not cause a reversal of a defendant's conviction. State v. Allen, 95-1754, p. 11 (La.9/5/96), 682 So.2d 713, 722. Finally, a defendant is not entitled to relief absent a showing of prejudice based on the missing portions of the record. State v. Castleberry, 98 1388, p. 29 (La.4/13/99), 758 So.2d 749, 773.
Harris first claims that the record is missing a letter, dated October 21, 1997, that the trial court said it would place in the record. The minute entry from that date does not refer to such letter. Harris avers that copies of the letter were mailed to the American Civil Liberties Union on December 3, 1997, the National Association for the Advancement of Colored People on December 4, 1997, and the Louisiana Disciplinary counsel on February 20, 1998. However, Harris makes no argument as to the content of the letter, or point to any reason why its absence from the record prejudices him. Thus, Harris is not entitled to any relief.
Harris next claims that the record does not contain a letter that the trial court ordered into the record on June 4, 1998. The minute entry from June 4, 1998 reflects that a status hearing was held that date. There is no reference to a letter being filed into the record that date. Again, he makes no argument as to the content of the letter, or points to any reasons why its absence from the record prejudices him. Thus, he is not entitled to any relief.
Thirdly, Harris argues that there is nothing in the record concerning a September 14, 1998 status hearing. There is no indication that a status hearing was held on September 14, 1998. A minute entry from September 9, 1998 reflects that the case was set for a status hearing on September 18, 1998. The record contains a transcript of that status hearing, held on September 18, 1998. Harris is apparently mistaken as to the date of the status hearing. Even assuming there was a status hearing on September 14, 1998, he has not shown how a missing transcript of such hearing has prejudiced him. Thus, he is not entitled to any relief.
Finally, Harris claims that the transcript is missing testimony by three witnesses who testified at trial, Ms. Smith and Ms. Lombard, who testified that he assaulted them as children, and T.G.,[2] the victim's brother. The transcript contains a certification by the court reporter that the transcript was a true and correct transcription of the trial proceedings. He offers no proof that any part of the testimony of those witnesses is missing from the transcript, and there is no indication from the transcript that any part of these witnesses' testimony is missing from the record. This assignment of error is also without merit.

IRRELEVANT TESTIMONY
Harris next claims that the trial court erred in ruling that testimony to be given by his witnesses was irrelevant. The trial transcript reflects that Harris called three witnesses, who all testified on direct examination without objection by the State, and without interruption by the trial court. At the conclusion of their testimony, the defense *88 rested. There is no indication that the trial court ruled that any testimony by Harris' witnesses was irrelevant. Harris also claims that the State excluded his witnesses. The record does not reflect that the State excluded any of the defense's witnesses.
Harris further claims that he was not allowed to cross-examine the victim's mother and father. The victim's mother, V.C.[3] was called as a witness by the defense, not the State, and thus was not subject to cross-examination by the defense. The victim's father, H.C., testified for the State in rebuttal. Following the State's direct examination of H.C., defense counsel elected not to question the witness. Accordingly, this assignment of error is without merit.

DECREE
For the foregoing reasons, Gill Harris' conviction and sentence are hereby affirmed.
AFFIRMED.
NOTES
[1] Due to the nature of the offense and the tender age of the victim, the victim, her mother, and her brothers will all be referred to by their initials, K.C., V.C., C.C. and T.G., respectively.
[2] Due to the nature of the offense, the victim's brother will be referred to by his initials, T.G.
[3] Due to the nature of the offense, the victim's mother and father will be referred to, respectively, by their initials, V.C. and H.C.